Slip Op. 17-103

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HARTFORD FIRE INSURANCE COMPANY, | |
| Plaintiff, | Before: Gary S. Katzmann, Judge |
| v. | Consol. Court No. 09-00122 |
| UNITED STATES, | |
| Defendant. | |

### OPINION

[Plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted in part and denied in part.]

Date:  August 10, 2017

Frederic Deming Van Arnam, Jr., Barnes, Richardson & Colburn, LLP of New York, NY, and William Horace Jeffress, Jr., Baker Botts, LLP of Washington, DC argued for plaintiff.

Edward Francis Kenny, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY argued for defendant.  With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Amy Rubin, Assistant Director, and Beverly A. Farrell, Trial Attorney.  Of counsel on the brief was Beth C. Brotman, Office of the Assistant Chief Counsel for International Trade Litigation, U.S. Customs and Border Protection, of Washington, DC.  With them on the reply brief was Chad A. Readler, Acting Assistant Attorney General.

Katzmann, Judge:  This case concerns a surety company that issued bonds to multiple importers to cover duties imposed, under the United States' customs laws, on entries of the importers' goods into the national commerce.  Despite billing the importers premium on these bonds, and accepting premium as to each bond, the surety now challenges the United States Customs agency's demands for payments on the bonds.  The surety alleges that, for a variety of reasons, defects in each of the bond forms at issue in this case void those bonds, nullifying

Customs' charges and releasing the surety from the obligations it assumed under the bonds.  The

United States Government, on behalf of Customs, opposes these contentions, and argues that the

bonds are valid, and that sovereign immunity bars the surety's defensive theory that its obligations

are discharged because its suretyship rights have been impaired.

Before the court are plaintiff Hartford Fire Insurance Company's ("Hartford") motion for

summary judgment, in which it seeks refund of $2.2 million paid to United States Customs and

Border Protection ("Customs") upon demands on sixty-one Single Entry Bonds ("SEBs" or

"bonds"), and Defendant United States' (or "the Government") cross-motion for summary

judgment.  See Pl.'s Mem. in Supp. of the Mot. for Summ. J., July 15, 2016, ECF No. 67 ("Pl.'s

Br."); Def.'s Mem. in Supp. of the Cross Mot. for Summ. J., Nov. 3, 2016, ECF No. 92 (Def.'s

Br.").  The court holds that the bonds at issue are valid, and that while the United States has waived

sovereign immunity as to the defensive theory of impairment of suretyship rights in the context of

cases contesting the denial of a protest, Hartford's claim in that respect fails.

Hartford is the undisputed surety on these SEBs, which insured several entries, imported

on or about December 1, 2003 through December 31, 2006, previously subject to antidumping

duty orders. Liquidation on the entries was suspended during the course of various relevant

administrative reviews.  Following the conclusion of those reviews Customs made demands on the

resulting import duties, but the importers in each case failed to pay.  Thus during 2007 and 2008,

Customs demanded that Hartford perform on the SEBs.  Hartford protested Customs' demands

pursuant to 19 U.S.C. § 1514(a)(3) (2006),[1] which Customs denied in each case.  Hartford paid

Customs in satisfaction of the demands and commenced various lawsuits before the Court of

International Trade pursuant to 28 U.S.C. § 1581(a) (2006), eventually consolidated into the thirty-

---

[1] Unless otherwise noted, all citations to the United States Code are to the official 2012 edition.

count complaint central to this test case.  Hartford seeks, inter alia, that its payments of Customs'

demands be refunded with interest as allowed by law.  See 28 U.S.C. §§ 2643–2644.

## UNDISPUTED FACTS

Per USCIT Rule 56.3, Hartford and the Government submitted separate statements of

material facts and responses thereto.  See Statement of Material Facts as to Which no Genuine

Issue Exists, July 15, 2016, ECF No. 67 ("Pl.'s Facts"); Def.'s Resp. Pl.'s Statement of Material

Facts as to Which no Genuine Issue Exists, Nov. 3, 2016, ECF No. 92 ("Def.'s Resp. Facts");

Def.'s Statement of Material Facts as to Which no Genuine Issue Exists, Nov. 3, 2016, ECF No.

92 ("Def.'s Facts"); Pl.'s Resp. Def.'s Statement of Material Facts as to Which no Genuine Issue

Exists, Feb. 6, 2017, ECF No. 101 ("Pl.'s Resp. Facts").  The following facts are not in dispute.

A customs bond or other security is required in order to import merchandise into the United

States. Def.'s Facts ¶ 3; Pl.'s Resp. Facts ¶ 3.  One permissible type of bond is an SEB, which

covers a single import transaction.  See generally 19 C.F.R. Part 113.  Prior to release of imported

merchandise into the commerce of the United States, the importer, or a customs house broker

acting as the agent of the importer, must submit the SEB to Customs for approval.  Pl.'s Facts ¶ 4;

Def.'s Resp. Facts ¶ 4.  Customs, in accepting SEBs, requires that they be submitted to the agency

in writing on Customs Form ("CF") 301.  Pl.'s Facts ¶ 2; Def.'s Resp. Facts ¶ 2; Def.'s Facts ¶ 2;

Pl.'s Resp. Facts ¶ 2.  The SEBs are submitted to Customs as part of an entry package, which also

includes a Customs Form 7501, the Entry Summary,[2] and may include a Customs Form 3461, the

Entry/Immediate Delivery form.[3]  Def.'s Facts ¶ 4; Pl.'s Resp. Facts ¶ 4.

     This consolidated action involves sixty-one SEBs submitted to Customs through various

ports, for shipments entered during the period of December 1, 2003, through December 31, 2006.

Def.'s Facts ¶ 5; Pl.'s Resp. Facts ¶ 5.  Hartford, a surety company, was the surety for these SEBs.

Consolidated Complaint ¶¶ 3, 7, 34, 47, 59, 71, 84, Jan. 13, 2012, ECF No. 32 ("Compl."); Pl.'s

Facts ¶1; Def.'s Resp. Facts ¶ 1; Def.'s Facts ¶ 1; Pl.'s Resp. Facts ¶ 1.  During the operative

period, Hartford's customs bond business was administered by its General Agent, James Gorman

---

[2] The Customs Form 7501 is a summary of the entry.  See Def.'s Ex. 17 ("CF 7501").  The version
of the form present in defendant's exhibit 17 was promulgated in June 2009, but the version
submitted with the entries at issue from December 1, 2003 through December 31, 2006, see Def.'s
Exs. 1–6, is substantially identical.  The form requires a declarant's signature as to the following:

> I declare that I am the . . . importer of record . . . I also declare that
> the statements in the documents herein filed . . . are true and correct
> . . . . I will immediately furnish to the appropriate customs officer
> any information showing a different state of facts.

A form required to make an entry of goods into the United States, a CF 7501 was included in the
entry packages of every transaction at issue in this case.  See 19 C.F.R. § 142.11 (2003) ("Customs
Form 7501 shall be used for merchandise formally entered for consumption . . . .").

[3] The Customs Form 3461 is an application for entry of the merchandise on immediate delivery.
See Def.'s Ex. 18 ("CF 3461").  The version of the form present in defendant's exhibit 18 was
promulgated in October 2009, but the version submitted with the entries at issue, see Def.'s Exs.
1–6, is substantially identical.  The form tracks the requirements of 19 C.F.R. §§ 142.3, 142.16,
142.22, and 142.24 (2003), and requires information about the import in question.  The Form
requires an applicant's signature in certification of the following:

> I hereby make application for entry/immediate delivery. I certify
> that the above information is accurate, the bond is sufficient, valid,
> and current, and that all requirements of 19 CFR Part 142 have been
> met.

This form was included in the entry packages of every transaction at issue in this case.

Insurance, Inc. ("JGII"), and JGII's president, James M. Gorman.  Def.'s Facts ¶ 6; Pl.'s Resp.

Facts ¶ 6.  The relationship between JGII and Hartford was set forth in a General Agency

Agreement that was entered into on or about September 4, 2002, and renewed on or about

September 3, 2004.  Def.'s Facts ¶ 8; Pl.'s Resp. Facts ¶ 8; Def.'s Ex. 10 ("GAA").  Hartford

terminated the GAA with JGII in 2008, and no longer actively markets Customs bonds. Def.'s

Facts ¶ 22; Pl.'s Resp. Facts ¶ 22.

The physical SEBs at issue were originally printed by Hartford's vendor and mirrored the

standard Customs Form 301, comprising five parts with different colors:  Part 1, the original bond

submitted to Customs, which was white; Part 2, the Surety's Copy, which was blue; Part 3, the

Principal's Copy, which was yellow; and Parts 4 and 5, two Brokers' Copies.  Pl.'s Ex. F ("CF

301"); Def.'s Facts ¶¶ 24–26; Pl.'s Resp. Facts ¶¶ 24–26.  These SEBs were designed to allow

information written thereon to transfer via carbonless chemical process from the top Part 1 original

through to the bottom Part 5 copy.  Def.'s Facts ¶ 27; Pl.'s Resp. Facts ¶ 27.  Hartford had its

printing vendor preprint Hartford's surety address on all five parts, but Gorman's signature, as

Hartford's attorney-in-fact, and Hartford's corporate seal, only appeared on the Part 1 original

submitted to Customs.  Def.'s Facts ¶ 28; Pl.'s Resp. Facts ¶ 28.  Gorman also requested that

Hartford have its commercial printing vendor imprint a seven-digit unique identifying number

preceded by the letters "SEB" on the lower left hand margin of all preprinted Hartford bonds.

Def.'s Facts ¶ 30; Pl.'s Resp. Facts ¶ 30.  Hartford kept track of these unique identifying numbers.

Def.'s Facts ¶ 33; Pl.'s Resp. Facts ¶ 33.

JGII distributed[4] the Hartford SEBs to retail insurance brokers, from whom importers, or

customs brokers on behalf of importers, obtained them.  Def.'s Facts ¶ 23; Pl.'s Resp. Facts ¶ 23.

Under the GAA, JGII had a duty to maintain complete copies of all bonds, the term "complete

copies" meaning a fully executed copy of the original that was submitted to Customs.  Def.'s Facts

¶¶ 13, 14; Pl.'s Resp. Facts ¶¶ 13, 14; GAA at Art. VII. The customs brokers, or importers, were

responsible for completing the bonds by providing the importer's information.  Def.'s Facts ¶ 31;

Pl.'s Resp. Facts ¶ 31.  Gorman was responsible for premium billing duties, premium collecting

duties, premium accounting duties, and possessed limited underwriting authority with regard to

---

[4] The parties debate the verb that correctly describes the movement of bonds from retail insurance brokers to customs brokers or customshouse brokers.  Citing the deposition of Robert Scott Cochrane, Hartford's Assistant Vice President of Bond Claims from 2003–05, and Vice President of Bond Claims thereafter, the Government characterizes this movement as a distribution, asserting that "[t]he retail insurance brokers then distributed [the SEBs] to customs brokers who sold the bonds to importers."  Def.'s Br. at 5 (citing Def.'s Ex. 7, Deposition of Robert Scott Cochrane, as Hartford's Rule 30(b)(6) designated witness ("Hartford Dep.") at 57).  The Government also asserts that "[t]he retail insurance brokers in turn provided [the SEBs] to customshouse brokers such as Vandergrift Forwarding Company, Inc. (Vandergrift) who would then distribute the bonds to customs brokers at ports where Vandergrift was not present."  Id. at 29.  Hartford counters that the Government's characterization is an attempt to depict an agency relationship between the insurance brokers, and thus JGII and Hartford, and the customs brokers.  Pl.'s Reply. at 15–16.  In reality, argues Hartford, the retail insurance brokers merely sold the bonds to the customs brokers or Vandergrift, who acted instead as attorneys-in-fact for the importers, and who never purported to act on Hartford's behalf.  Id.; Pl.'s Resp. Facts ¶ 10.  The operative citation to the Hartford Dep. at 57 is:

> My understanding is Gorman distributed the bonds to retail -- what we will call retail insurance agents or brokers.  Those retail insurance agents or brokers would distribute [the SEBs] and provide them to the importers or the customshouse brokers, where the attorney-in-fact for the importers to complete and submit to Customs for approval and acceptance.

See also Transcript of Oral Argument ("Oral Arg. Tr.") at 185, ECF No. 115.  The court does not reach the issue of whether Hartford ratified the actions of its alleged agents under the facts of this case, and so need not opine on the correct terminology as a matter of law.

customs bonds issued by JGII for which Hartford was surety.[5]  Def.'s Facts ¶ 9; Pl.'s Resp. Facts ¶¶ 9, 12; GAA at Arts. I, II.   Gorman maintained a list of hundreds of customs brokers he had approved for the use of the retail insurance brokers beneath him.  Def.'s Facts ¶ 39; Pl.'s Resp. Facts ¶ 39.  As part of the process of billing customs brokers and importers for premiums on these bonds, JGII generally reviewed the blue surety copy of the multiform CF 301, provided by the retail insurance brokers.  Def.'s Facts ¶¶ 32, 42; Pl.'s Resp. Facts ¶¶ 32, 42.  Gorman testified that during the operative time period, Hartford charged the importer principals $25 per every $1,000 the SEBs covered.  Def.'s Ex. 8, Deposition of James M. Gorman ("Gorman Dep.") at 125–29.[6]

Gorman had instructed the customs brokers to complete the bonds in accordance with the applicable federal regulations, but never stopped doing business with a given customs broker because of the broker's failure to complete bonds correctly.  Def.'s Facts ¶¶ 41, 47; Pl.'s Resp. Facts ¶¶ 41, 47.  On occasion, Gorman would discover a pattern of specific error common to multiple Hartford SEBs issued by a given customs broker, and would call the customs broker to complain about the manner in which they were completing the bond.  Def.'s Facts ¶ 43; Pl.'s Resp. Facts ¶ 43.  Gorman would also on occasion alert Hartford's Account Representative, Raymond MacMath,[7] if he had noticed a pattern of error common to SEBs issued by a given broker. Def.'s Facts ¶ 44; Pl.'s Resp. Facts ¶ 44.  The representative in turn advised Gorman that it was not his

---

[5] Gorman performed no underwriting on the bonds at issue in this case, and Hartford maintained no underwriting files for them.  Oral Arg. Tr. at 74–75; Def.'s Facts ¶ 18; Pl.'s Resp. Facts ¶ 18.

[6] No contrary evidence having been presented, the court accepts this fact as undisputed.

[7] Gorman testified that MacMath served as liaison between himself and Hartford.  Gorman Dep. at 20, 23, 29.  Gorman also testified that MacMath was uninterested in the ultimate fate of the blue surety copies of the SEBs that JGII retained for a period of time.  Id. at 68.  The court accepts these facts as undisputed.

responsibility to inform Customs of errors on bonds that the agency had accepted.  Def.'s Facts ¶ 45; Pl.'s Resp. Facts ¶ 45.  Therefore Hartford billed premium on such bonds even if a pattern of error common to bonds issued by a given customs broker were noticed.  Def.'s Facts ¶ 43; Pl.'s Resp. Facts ¶ 43.  Hartford billed and was paid premiums for all the bonds at issue in this action. Def.'s Facts ¶ 21; Pl.'s Resp. Facts ¶ 21.

## PROCEDURAL HISTORY

The sixty-one SEBs initially at issue cover transactions made on behalf of five different importers, who are also principals on their respective bonds:   FastTrack Merchants, Inc. ("FastTrack"), whose five bonds are associated with the Consolidated Complaint Appendix 1 entries;[8] Jinfu Trading (USA), Inc. ("Jinfu"), whose two bonds are associated with the Consolidated Complaint Appendix 2 entries ("Jinfu I bonds")[9] and whose forty-five bonds are associated with the Consolidated Complaint Appendix 3 entries ("Jinfu II bonds");[10] Farmland Food Trade, Inc. ("Farmland"), whose six bonds are associated with the Consolidated Complaint Appendix 4 entries;[11]  New Century Furniture Manufacturer, Inc. ("New Century"), whose two

---

[8] Made between the months of April and August 2006 at the ports of Memphis, Tennessee and San Francisco, California.  Compl. ¶ 6.

[9] Made on February 18, 2004 and in May 2004 at the ports of Newport News, Virginia and Houston, Texas.  Compl. ¶ 33.

[10] Made between January 29, 2004 and November 4, 2004 at the port of Los Angeles, California. Compl. ¶ 46.

[11] Made between March and April 2006 at the port of Boston, Massachusetts.  Compl. ¶ 58.

bonds are associated with the Consolidated Complaint Appendix 5 entries;[12] and SCS Marketing, Inc. ("SCS"), whose one bond is associated with the Consolidated Complaint Appendix 6 entry.[13]

Each of the sixty-one entries associated with an SEB at issue was liquidated by Customs pursuant to an applicable antidumping duty order.  Customs demanded payment of duties from the importers, who failed to pay either the antidumping duties assessed on the imports or any interest that had accrued thereon.  Compl. ¶¶ 9–11, 36–38, 49–51, 61–63, 73–75, 86–88.  Customs therefore sent demand letters to Hartford for payment on the SEBs securing their respective imports.  Compl. ¶¶ 12, 39, 52, 64, 76, 89; Def.'s Facts ¶ 48; Pl.'s Resp. Facts ¶ 48.  After receiving the formal demands from Customs, Hartford made a Freedom of Information Act ("FOIA") request to the agency, seeking any and all entry documents associated with the underlying entry, including any SEBs submitted to Customs at the time of the entry.  Compl. ¶¶ 13, 40, 53, 65, 77, 90.  In response, Customs sent Hartford the entry documents associated with each entry, including photocopies of the relevant SEBs, CFs 7501, and, where present, CFs 3461.  Compl. ¶¶ 14, 41, 54, 66, 78, 91.  Hartford timely protested the demands for payment on the SEBs, and Customs denied Hartford's protests thereafter.  Compl. ¶¶ 31, 44, 56, 68, 81, 93; Def.'s Facts ¶ 49; Pl.'s Resp. Facts 49.  Hartford then timely paid all charges, fees, and interest demanded by Customs on the bonds.  Compl. ¶¶ 32, 45, 57, 69, 82, 94.  Having done so, Hartford filed suit before this court to contest the denial of each protest.  Def.'s Facts ¶ 49; Pl.'s Resp. Facts ¶ 49.

Hartford brought suit in its lead case on March 13, 2009.  Summons, ECF. No. 1.  Hartford moved to consolidate several cases posing essentially identical issues, and to file a consolidated

---

[12] Made on February 7, 2005 and September 27, 2005 at the port of Los Angeles, California. Compl. ¶ 70.

[13] Made on December 6, 2005 at the port of Houston, Texas.  Compl. ¶ 83.

complaint, on January 12, 2012.  ECF. No. 30.  The next day, Hartford's motion was granted, ECF No. 31, and Hartford's Consolidated Complaint was deemed filed.  Compl.  The Government answered on March 27, 2012.  ECF No. 35.  On June 28, 2012, Hartford, with the Government's consent, moved to designate the lead case, Consol. Court No. 09-00122, as a test case, under which would be suspended dozens of similar actions containing at least one of the various "bond defect" arguments raised in the lead case.  ECF No. 39.  The court granted that motion on July 2, 2012. ECF No. 40.

Hartford filed its motion for summary judgment on July 15, 2016.  Hartford now challenges in its motion for summary judgment Customs' demands for payment on the grounds that the SEBs are void due to their noncompliance with certain federal regulations controlling the bonding process under 19 C.F.R. § 113.  Alternately, Hartford argues that even if the SEBs remain valid under the Part 113 regulations despite these facial defects, many of the bonds are nonetheless void under traditional concepts of contract law.  Finally, Hartford argues that Customs, by accepting SEBs that do not comply with the regulatory regime, has impaired Hartford's suretyship rights against the defaulted importers, and thus Hartford is discharged from its suretyship obligations.

The Government cross-moved for summary judgment on November 3, 2016.  The Government argues first that the court lacks jurisdiction over all forty-five Appendix 3 Jinfu II bonds, because Hartford did not raise its instant arguments in its underlying protest as to the charges on those bonds, and, separately, over two bonds, because Hartford failed to pay the total amount demanded by Customs on each pursuant to 28 U.S.C. § 2637.  In the event the court possesses jurisdiction over those bonds, and as to the remaining SEBs, the Government argues that technical deficiency on the face of a bond does not void the instrument, as the required paperwork for each import transaction provides the absent information, or establishes a contract between the

surety and the principal.  The Government argues also that the doctrine of sovereign immunity

bars Hartford's claim against the United States for impairment of its suretyship rights.

On November 18, 2016, after the passing of the assigned judge, the case was reassigned to

a new judge pursuant to 28 U.S.C. § 253(c) and USCIT Rule 77(e)(4).  Order of Reassignment,

ECF No. 94.  Hartford filed its reply in support of its own motion, and response to the

Government's cross-motion, on February 6, 2017.  ECF No. 100 ("Pl.'s Reply").  The Government

filed its reply on March 2, 2017.  ECF No. 104 ("Def.'s Reply").  The court issued to parties on

May 25 and June 13, 2017, letters containing questions to be answered and discussed during oral

argument.  ECF Nos. 107, 108.  Oral argument was held before the court on June 20, 2017.  ECF

No. 110.

## DISCUSSION

## JURISDICTION AND STANDARD OF REVIEW

Customs' demands against Hartford as surety on the SEBs at issue in this case constitute

protestable "charges or exactions of whatever character within the jurisdiction of the Secretary of

the Treasury" under 19 U.S.C. § 1514(a)(3) and accordingly are subject to review under 28 U.S.C.

§ 1581(a).  Hartford has standing to bring this action pursuant to 28 U.S.C. § 2631(a).  Jurisdiction

over this timely filed action is thus proper under 28 U.S.C. § 1581(a).  The court reviews denied

protests de novo "upon the basis of the record made before the court."  See 28 U.S.C. § 2640(a)(1).

As noted, both parties have moved for summary judgment.  Summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477

U.S. 317, 322 (1986); see USCIT Rule 56(a).  The standard does not require that no facts be in

dispute, as "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The movant bears the burden of demonstrating that there exists no genuine issue of material fact that would warrant a trial. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Meanwhile, the evidence must be considered in a light most favorable to the non-moving party. Id.

## ISSUES

I.    Whether the Court Possesses Jurisdiction over the Forty-Five SEBs Associated with Hartford's Appendix 3 Entries

The Government argued that the court does not possess jurisdiction over the forty-five Appendix 3 Jinfu II bonds, because Hartford did not assert in the underlying protest, No. 2704-07-101317, the arguments that it asserts before this court, namely, that the bonds were not signed by the principal or the principal's agent or that the bonds are void by virtue of any facial defects.[14] Def.'s Br. at 11–13; see Def.'s Ex. 13 ("Protest No. 2704-07-101317"). Protest No. 2704-07-101317, which covers the Jinfu II bonds, does not contain these arguments; rather, Hartford therein

_____

[14] The Government cites Computime, Inc. v. United States, 772 F.2d 874, 878 (Fed. Cir. 1985) for the proposition that, though a protest is to be liberally construed, "[t]his does not, however, mean that protests are akin to notice pleadings and merely have to set forth factual allegations without providing any underlying reasoning." The Government connects this admonition to 19 U.S.C. § 1514(c)(1)(C), commanding that "[a] protest must set forth distinctly and specifically . . . the nature of each objection and the reasons therefor . . . ." The Government also points to Ammex Inc. v. United States, 27 CIT 1677, 1684–85, 288 F. Supp. 2d 1375, 1381–82 (2003) for the proposition that an action should be dismissed where the underlying protest "did not state reasons for objection or explain the justification for the objection" to Customs' demands. Def.'s Br. at 13.

argued that Customs' claims on the SEBs should be cancelled because those bonds "do not guaranty antidumping compensation under the Byrd Amendment."

Hartford argued in its Reply that the court possesses jurisdiction over the forty-five Jinfu II bonds pursuant to 28 U.S.C. § 2638, which provides:

> In any civil action under [19 U.S.C. § 1515] in which the denial, in whole or in part, of a protest is a precondition to the commencement of a civil action in the Court of International Trade, the court, by rule, may consider any new ground in support of the civil action if such new ground
>
> (1) applies to the same merchandise that was the subject of the protest; and
>
> (2) is related to the same administrative decision listed in [19 U.S.C. § 1514] that was contested in the protest.[15]

---

[15] Citing legislative history and <u>Dow Chemical Co. v. United States</u>, 10 CIT 550, 558–59, 647 F. Supp. 1574, 1582 (1986), Hartford reads § 2638(2)'s description of a new ground "related to the same administrative decision listed in [19 U.S.C. § 1514]" as referring to an argument made before the court that derives from the same subsection of § 1514 invoked in the underlying protest. Here, that subsection is § 1514(a)(3), challenges to "all charges or exactions of whatever character within the jurisdiction of the Secretary of the Treasury." Per <u>Hartford Fire Ins. Co. v. United States</u>, 544 F.3d 1289 (Fed. Cir. 2008) ("<u>Hartford I</u>"), challenges to Customs' demands on surety bonds subject to protest come under 19 U.S.C. § 1514(a)(3). Hartford thus argued in its Reply that because its arguments in both the underlying protest and its filings before this court comprise challenges to the Customs' demands on the SEBs, they both come under § 1514(a)(3), and are "related to the same administrative decision" pursuant to 28 U.S.C. § 2638(2). Pl.'s Reply at 22–26.

In its own Reply, the Government counters Hartford's citation to 28 U.S.C. § 2638 on the basis of the Court's analysis of that statute's history in <u>Atari Caribe, Inc. v. United States</u>, 16 CIT 588, 799 F. Supp. 99 (1992). Def.'s Reply at 16–17. Specifically the Government presented that case as supporting the proposition that a new ground for argument can only be raised where it was "clear that the basis of the protest was in the mind of the protestant at the time the protest was filed and that the basis of the protest was made known to the Customs officer so that he could have had an opportunity to correct his mistake." 799 F. Supp. at 105. The Government asserts that, in point of procedure, Hartford has failed to, and cannot carry its "burden of showing [it] is properly in court." <u>McNutt v. Gen. Motors Acceptance Corp.</u>, 298 U.S. 178, 189 (1936); Def.'s Br. at 13.

However, in response to questions posed in the court's letter to the parties of June 13, 2017, specifically, regarding Hartford's new theory that initials on the bonds do not constitute valid signatures, see Pl.'s Br. at 11 n.13, Hartford during oral argument withdrew its merits arguments as to the forty-five Jinfu II bonds in Appendix 3.[16]  Oral Arg. Tr. at 12–14.  "[W]here, as here, the underlying controversy is clearly moot, the preferred course is to decide mootness, before reaching difficult questions more closely tied to the merits of the underlying controversy, such as subject matter jurisdiction." Kaw Nation v. Norton, 405 F.3d 1317, 1323 (Fed. Cir. 2005).  The underlying merits arguments being moot, the court need not resolve the jurisdictional question involving the new grounds statute, and declines to do so.[17]

II.   Whether the Court Possesses Jurisdiction over the bonds Associated with Hartford's entries JN7-0332527-2 in Appendix 2 and 316-0516897-5 in Appendix 3

A. Parties' Arguments

With respect to two bonds — SEB0137076 covering Entry JN7-0332527-2 in Appendix 2, and SEB0144586 covering Entry 316-0516897-5 in Appendix 3 — the Government contends that this court lacks jurisdiction because Hartford failed to pay the entirety of charges Customs demanded on them prior to commencing this lawsuit.  Def.'s Br. at 13–14.  Specifically, the

---

[16] The court commends Hartford's counsel for their forthrightness in withdrawing these arguments, and, indeed, commends both parties' counsel for the high quality of briefing, argumentation, and civility they have demonstrated throughout all stages of this case.

[17] With respect to the new grounds statute, there remains no justiciable "case" or "controversy," the constitutional prerequisite to all Article III jurisdiction, concerning the Appendix 3 Jinfu II bonds.  U.S. Const. art. III, § 2, cl. 1; DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so."); see Norsk Hydro Can., Inc. v. United States, 472 F.3d 1347, 1355 (Fed. Cir. 2006) ("It is true that the Court of International Trade, like all federal courts, is a court of limited jurisdiction, and that the party invoking that jurisdiction bears the burden of establishing it.").

Government argues that Hartford has failed to fulfill the jurisdictional prerequisite of 28 U.S.C. §

2637(a), which mandates that

> [a] civil action contesting the denial of a protest . . . may be
> commenced in the Court of International Trade only if all liquidated
> duties, charges, or exactions have been paid at the time the action is
> commenced, except that a surety's obligation to pay such liquidated
> duties, charges, or exactions is limited to the sum of any bond related
> to each entry included in the denied protest.

Def.'s Br. at 13–14.

In its Reply, Hartford conceded that its payment, prior to filing its summons, on the bond

covering Entry 316-0516897-5 in Appendix 3 did not satisfy the 28 U.S.C. § 2637 requirement,

and thus the court has no jurisdiction over it.  Pl.'s Reply at 26.  But Hartford argues that the court

does possess jurisdiction over the bond covering Entry JN7-0332527-2 in Appendix 2.  Id.

Hartford paid $43,494.43 on October 22, 2007, prior to filing its summons four days later, to satisfy

Customs' demand on the bond, despite that the penal sum,[18] as the Government alleges, is $44,000.

Def.'s Ex. 19.  To support its assertion that the penal sum on the SEB was $44,000, the Government

furnishes Part 2, considered the "Surety's Copy," of the relevant CF 301, which lists the penal sum

on the SEB as $44,000.  Def.'s Ex. 9, Deposition of Bruce Ingalls ("Ingalls Dep.") at 94; Def.'s

Ex. 2 at 12; Def.'s Br. at 14.  By contrast, the corresponding Part 1, considered "Customs' copy,"

lists no penal sum whatsoever. Def.'s Ex. 2 at 11; Def.'s Br. at 14.  Regardless of this facial

disparity, which Hartford highlights, Pl.'s Reply at 26–30, the Government emphasizes that "the

---

[18] The penal sum on an SEB is the dollar amount which the surety is obligated to cover in the event
that the importer, as principal on the bond, fails to pay Customs' demands.  See 19 U.S.C. §
1623(b)(1) ("Whenever a bond is required or authorized by a law, regulation, or instruction which
. . . the Customs Service is authorized to enforce, the Secretary of the Treasury may . . . fix the
amount of penalty thereof, whether for the payment of liquidated damages or of a penal sum . . .
.).  On the CF 301, this value is represented as the "limit of liability."  Def.'s Facts ¶¶ 16, 88; Pl.'s
Resp. Facts ¶¶ 16, 88; Pl.'s Br. at 21 (referring to "the limit of liability/penal sum of the bond").

evidence reflects that Customs sought payment of the full amount of the bond ($44,000), and

Hartford only paid $43,494.43." Def.'s Reply at 18 (citing Def.'s Ex. 19). By failing to pay the

full penal sum, the Government argues, Hartford has failed to satisfy the jurisdictional predicate

of § 2637(a), and thus the court lacks jurisdiction over Hartford's claims as to SEB 0137076.

Hartford points to the Ingalls Dep. at 73–74, in which Customs' representative explained

that in situations where a bond does not show a penal sum, Customs would treat the bond's penal

sum as the specific amount listed on the Form 7501 included in the entry package. Pl.'s Reply at

27. Customs "do[es] not round up" from that amount to the nearest thousand. Id. (quoting Ingalls

Dep. at 73–74). Hartford emphasizes that Part 1 is that which is submitted to Customs, while

"[Parts] 2-4 are for people other than CBP." Id. at 28 n.76 (citing Ingalls Dep. at 94).

Hartford explains that upon importer's default, sureties receive a "612 Report" from

Customs listing the debt owed by the importer on entries secured by the surety's bonds.[19] Pl.'s

Reply at 29. The amount Customs demands of the surety is the amount owed by the importer, plus

interest accrued as of the date of the 612 Report. Id. Hartford further explains that "to ascertain

the limit of its own obligation to Customs," the surety consults the penal sum on the bond, see §

2637(a) ("a surety's obligation to pay . . . is limited to the sum of any bond related to each entry"),

and obtains a copy of the SEB's Part 1 submitted to Customs at entry via the FOIA. Id. Because

the copy so obtained listed no penal sum, Hartford asserts that the amount to which it was obligated

was the cash deposit amount specified on the Form 7501 accompanying the entry JN7-0332527-

2, $43,494.43, which Hartford paid in full. Id.; Compl. ¶ 45.

---

[19] "Each month, the Revenue Division sends each surety a report listing their open bills by importer name. The report, known as the 612 Report, provides the surety with specific entry, bill, and protest information as reflected in [the Automated Commercial System] at the end of the month." Surety Inquiries, U.S. CUSTOMS AND BORDER PROTECTION, https://www.cbp.gov/trade/priority-issues/revenue/surety-inquiries (last visited Aug. 7, 2017).

B.  Analysis

The statute, and precedent, offer no berth for discretion.  "Case law unambiguously holds

that the requirements of § 2637(a) are strictly applied and the statute precludes any exercise of

discretion by the Court."  Great Am. Ins. Co. of N.Y. v. United States, 34 CIT 523, 527, 710 F.

Supp. 2d 1346, 1350–51 (2010).

The Government asserts that "Customs sought payment of the full amount of the bond

($44,000)."  Def.'s Reply at 18.  Hartford states that it referred to the SEB's Part 1, lacking penal

sum, via the FOIA in order to determine its own limit of liability.  Pl.'s Reply at 29.  Hartford

therefore paid only the assessed cash deposit amount, as it is the minimum amount that any bond

must cover.  Id.  Militating against Hartford, however, is the fact that the SEB's Part 2 is intended

for sureties.  Gorman Dep. at 122 ("Q:  And in the normal course of business, you would receive

a surety copy? A:  It's the blue accounting copy, yes.");  Def.'s Facts ¶ 31;  Pl.'s Resp. Facts ¶ 31.

This Part 2, containing the penal sum of $44,000, would have found its way to Hartford's general

agent, who maintained Parts 2 and used them to bill importer's premium.  Gorman Dep. at 129

(explaining that JGII would be unable to bill premium on an SEB lacking penal sum), 126 ("It's a

charge per thousand dollars of risk.  Okay?  So Hartford gets $25 per 14 thousand.");  Def.'s Facts

¶ 21 ("Hartford does not dispute that premium was paid on each of the sixty-one bonds at issue.");

Pl.'s Resp. Facts ¶ 21 ("Admits.");  see also Ingalls Dep. at 260–62.

The jurisdictional predicate imposed by § 2637(a) is strictly applied and is not subject to

excuse based upon the assertion of equitable principles.  Great Am. Ins., 710 F. Supp. 2d at 1350–

51;  Dazzle Mfg., Ltd. v. United States, 21 CIT 827, 828, 971 F. Supp. 594, 596 (1997) ("The

condition is to be strictly applied and the statute precludes any exercise of discretion by the court."

(citing Penrod Drilling Co. v. United States, 13 CIT 1005, 1007, 727 F. Supp. 1463, 1465 (1989),

reh'g denied, 14 CIT 281, 740 F. Supp. 858 (1990), aff'd, 925 F.2d 406 (Fed. Cir. 1991)); Nature's

Farm Prod., Inc. v. United States, 819 F.2d 1127 (Fed. Cir. 1987).  The court is unpersuaded by

Hartford's suggestions that the facial disparity between the Parts 1 and 2 indicates the necessity of

holding Customs to regulatory procedures encapsulated in Part 113.  Pl.'s Reply at 29 ("When

presented with a bond, Customs's responsibilities are clear–it must determine if the bond is in

proper form . . . . If the bond is missing essential terms–as it was here–then 'CBP should have

rejected it . . . .'" (citing Pl.'s Ex. B, Department of Homeland Security Office of Inspector General

Report ("OIG Report")[20] at 5)).  Hartford was obligated to pay "all liquidated duties, charges, or

exactions . . . limited to the sum of any bond related to each entry included in the denied protest"

prior to obtaining judicial review before this court.  In short, the court lacks jurisdiction over

Hartford's claims as to this bond.

III.     Whether the SEBs are Enforceable Under the Part 113 Regulations

         As has been noted, Hartford has withdrawn its arguments as to the forty-five bonds

associated with the Appendix 3 entries, and the court lacks jurisdiction over the bond associated

with entry JN7-0332527-2 in Appendix 2.  Accordingly, what remains for the court is the

consideration of the parties' arguments on the merits as to fifteen of the original sixty-one bonds

in this case.[21] The court turns first to their validity under the Part 113 regulations.[22]

---

[20] The OIG Report, published June 27, 2011 with the expectation that "this report will result in
more effective, efficient, and economical operations," is formally titled "Efficacy of Customs and
Border Protection's Bonding Process."  OIG Report at Preface.  It "addresses the efficacy of U.S.
Customs and Border Protection's bonding processes.  It is based on interviews with employees and
officials of relevant agencies and institutions, direct observations, and review and testing of
applicable documents."  Id.

[21] All bonds covering entries in Appendices 1, 4, 5, and 6, and the one remaining Appendix 2 bond.

[22] The court analyzes the versions of each Part 113 regulation in force at the time Customs accepted
the SEBs at issue.

A.  Parties' Arguments

Hartford argues that each of the SEBs at issue is incomplete in that it lacks information

required by a regulation under Part 113, and thus all are unenforceable against Hartford.  Pl.'s Br.

at 14.  Hartford emphasizes that Customs must ensure the bonds are "in proper form," and that a

surety posting the bond must submit the bond "on Customs Form 301."  Pl.'s Br. at 14; 19 C.F.R.

§ 113.11.  Section 113.21 sets out "information required on the bond":  names, addresses of the

principal places of business and legal designations of corporate principals and sureties "must

appear," § 113.21(a), on the CF 301; a bond is to "bear the date it was actually executed," §

113.21(b); the bond "shall be stated in figures," § 113.21(c).  Pl.'s Br. at 15.  Section 113.33

meanwhile states that the bonds of corporate principals "shall be signed by an authorized officer

or attorney . . . ."  Id.  Section 113.37 states that bonds executed by a corporate surety "must be

signed" by an authorized officer or attorney of the corporation.  Id.  Hartford asserts that these

regulatory provisions require, through "mandatory terms," such as "must" or "shall," that these

elements be included.  Pl.'s Br. at 15.  Hartford argues that Customs had "no discretion to disregard

these regulatory requirements."  Id. (citing United States v. Utex Int'l, Inc., 857 F.2d 1408, 1413

(Fed. Cir. 1988) ("[t]he bond can not [sic] be interpreted contrary to law and regulations")

(citations omitted); OIG Report at 5 ("[f]ederal regulations provide specific information that STBs

must include prior to CBP's approval"); Ingalls Dep. at 33–34).  Accordingly Hartford contends

that Customs "should be required to cancel the improper charges and demands made against the

bonds and return those payments to Hartford."  Pl.'s Br. at 16 (citing Sioux Honey Ass'n v. United

States, 34 CIT 1077, 1100, 722 F. Supp. 2d 1342, 1364 (2010) (recognizing Customs'

"longstanding authority" to cancel bonds charges); Union of Concerned Scientists v. Atomic

Energy Comm'n, 499 F.2d 1069, 1082 (D.C. Cir. 1974) (recalling the "well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action")).

Hartford further characterizes the rejection of bonds technically incomplete or noncompliant with Part 113 as Customs' "long-standing practice," to which the agency should be required to adhere in this case.[23]  Pl.'s Br. at 17 (citing Pl.'s Exs. L, M, N). Hartford also points to its Exhibit H, Customs' Entry/Summary Rejection Sheets, which document Customs' practice of rejecting customs bonds missing essential elements, according to Hartford's characterization.  Pl.'s Br. at 18.  Hartford adds that "Customs should not be permitted to take the diametrically opposite position in this litigation . . . . Government agencies are bound by law and regulation, not whim and circumstance."  Id.

The Government argues that Hartford was obligated to ensure completeness of the bonds, which it distributed and for which it billed premium, under the regulations.[24]  Def.'s Br. at 16.

---

[23] In its Reply, Hartford emphasizes Customs' regulatory obligations, pointing to its Ex. J at 6–8, a Standard Operating Procedure document provided at the Long Beach Seaport in 2010, wherein Customs instructed its officials that "the entry package must be rejected" if certain items are "missing or incomplete," including principal name and address.  Pl.'s Reply at 6.   Another Standard Operating Procedure document, Ex. J at 23–24, issued in May 2007 in San Francisco, admonishes that "bonds must be accurate," as "[t]he surety is entitled to stand upon the strict terms of its agreement and it can be bound in no other way."  Pl.'s Reply at 6–7.  Hartford also points to a Field Operations Public Bulleting, Ex. J at 9–10, issued in December 2010 in Los Angeles and regarding "Single Transaction Bond Guidelines for Entry Release," in which the agency explained that it "verifies all [bond] data elements against the information from the entry package," and "if discrepancies are found, the entry package must be rejected for correction and resubmission."  Pl.'s Reply at 6.  Hartford then characterizes Customs' attempt in 2010 to amend 19 C.F.R. § 113.21 to allow the agency to "presume, without verification, that submitted bond applications . . . are in full compliance with all applicable law," as an indication that Customs at that time recognized its obligation to review and approve only compliant bonds.  Pl.'s Reply at 7 (citing Notice of Proposed Rulemaking, 75 Fed. Reg. 266, 269 (Jan. 5, 2010)).

[24] The Government also articulates an obligation on the part of Hartford "to inform Customs that the Form 301 submitted was incomplete or did not constitute a contract" upon receiving the Part 2 Surety element of the SEB.  Def.'s Br. at 16 (citing Customs Form 7501's direction to the surety

From that view, Hartford failed to satisfy its own burden under the regulatory scheme, despite that it received premium on the bonds.  Id.; Def.'s Ex. 11, Plaintiff's Response to Defendant's First Interrogatories ¶¶ 10, 11.  As to Customs' obligations under the regulations, the Government argues that the Part 113 regulations are directory rather than mandatory.[25]  Def.'s Br. at 18.  The Government notes that the Federal Circuit has concluded that 19 C.F.R. § 113.37(g), governing the use and content of Customs Form 5297,[26] regarding powers of attorney for the agent or attorney of the surety, protects Customs, not the surety, and that this court should make the analogous conclusion as to the remaining Part 113 provisions.  Id. (citing United States v. Great Am. Ins. Co. of NY, 738 F.3d 1320, 1334 (Fed. Cir. 2013)).   Thus the Government asserts that Customs had only the right, but not the obligation, to reject the SEBs at issue,[27] also construing the OIG Report as being concerned with the possibility that Customs might be sued by aggrieved sureties for accepting noncompliant bonds, rather than representing any longstanding practice to which the agency should now be bound.  Def.'s Br. at 18–19.

---

or the surety's agent to "immediately furnish to the appropriate CBP officer any information showing a different statement of facts").

[25] The Government argues that the Part 113 regulations "do not affect the rights of the parties," but rather "serve as a guide or checklist to Customs to assist it in determining whether the principal and surety intended to be bound by a bond submitted to Customs."  Def.'s Br. at 18.  The Government emphasizes that Hartford presents no legal basis for the prospect that failure to comply with Part 113 Regulations voids the noncompliant bond.  Def.'s Reply at 6–7.

[26] Specifically, corporate sureties "may execute powers of attorney to act in their behalf" by filing Customs Form 5297 with Customs.  19 C.F.R. § 113.37(g)(1), (2).  "Corporate surety powers of attorney will continue in force and effect until revoked."  Id. at (4).

[27] The Government characterizes Hartford's collected prior Customs Rulings, Pl.'s Exs. L, M, N, and the Ex. H Entry/Summary Rejection Sheets as either containing materially different facts or memorializing situations in which serious questions arose as to whether surety and importer intended to contract, and if so, whether the bonded amount was sufficient.  Def.'s Br. at 19–20.

B.  Analysis

The court finds that the relevant subsections of Part 113, as regards the contents of a valid and enforceable bond, are directory, procedural regulations, such that the bonds' noncompliance to them does not necessarily void subsequent agency action.

The court looks first to the plain text of the regulations.  As applied to the Government, this Court has held that the word "shall" is to be construed as "may," unless a contrary intention is clear.[28] Eagle Cement Corp. v. United States, 17 CIT 624, 626 (1993) (citing Barnhart v. United States, 5 CIT 201, 203, 563 F. Supp. 1387, 1389 (1983)), aff'd, 26 F.3d 137 (Fed. Cir. 1994)). There is no clear contrary intention in the plain text of the regulations.  Reading them as a whole and for their structure, the court finds none explicitly commands action or certain behavior by Customs, but rather speaks directly to the contents of bonds submitted to Customs. E.g. 19 C.F.R. § 113.21(a)(1) ("In the case of a corporate principal or surety, its legal designation . . . shall appear [on the bond]."); § 113.21(b) ("Each bond shall bear the date it was actually executed."); § 113.33(b) ("The bond of a corporate principal shall be signed by an authorized officer or attorney of the corporation . . . ."); § 113.33(a) ("The name of a corporation executing a Customs bond as a principal, may be printed or placed thereon . . . ."); § 113.37(e) ("A bond executed by a corporate surety shall be signed by an authorized officer or attorney of the corporation . . . .").

With that context, the court gives weight to the Government's analogy likening the instant regulations to 19 C.F.R. § 113.37(g), which the Federal Circuit has held protects Customs, not the

---

[28] The usage of the word "shall" could mandate action where Customs elsewhere in the same section uses the permissive "may."  Kingdomware Techs., Inc. v. United States, 136 S. Ct. 1969, 1977 (2016) ("When a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty.").  However, that reading is not dispositive of the inquiry before the court for the reasons discussed infra.

surety.  See Great Am. Ins., 738 F.3d at 1334 ("[Section 113.37(g) (2013)] is not even written as

a directive to Customs to reject certain bonds.  Rather . . . it protects Customs against any later

denial of actual authority by the corporate surety . . . .").  That provision, which covers "Power of

attorney for the agent or attorney of the surety," regulates submission of a particular official form,

CF 5297, to Customs.  Id.  Here too the relevant regulations speak to the content of a form

submitted to Customs, CF 301, rather than the agency's behavior.  Compare United States v. UPS

Customhouse Brokerage, Inc., 575 F.3d 1376, 1382–83 (Fed. Cir. 2009) (holding that 19 C.F.R. §

111.1 (2000), which lists "factors which [Customs] will consider," is mandatory, not discretionary,

and that "any interpretation of § 111.1 that does not require [Customs'] consideration of the listed

factors is clearly inconsistent with the plain language of the regulation").

Moreover, even assuming the Part 113 regulations were so written, it would be difficult to

read them as mandatory where their plain text does not contain "consequential language"

explaining repercussions of the agency's ostensible noncompliance with the highlighted "shall"

language.  Hitachi Home Elecs. (Am.), Inc. v. United States, 661 F.3d 1343, 1347 (Fed. Cir. 2011)

(citing Canadian Fur Trappers Corp. v. United States, 884 F.2d 563, 566 (Fed. Cir. 1989)).  No

such consequence is found in the Part 113 regulations, as both parties agreed at oral argument.

Oral Arg. Tr. at 44–46, 115.

The court looks also to the history of Part 113 and CF 301, which buttresses the conception

that they are intended to simplify bonding transactions rather than modify rights in private parties.

As summarized in Customs' 1983 Notice of Proposed Rulemaking:

> The bond . . . guarantees that proper entry summary, with payment of estimated duties and taxes when due, will be made for imported merchandise and that any additional duties and taxes subsequently found to be due will be paid. The bond also guarantees redelivery of imported merchandise to Customs custody for examination or inspection if found not to comply with applicable laws and regulations.

48 Fed. Reg. 11,032 (Mar. 14, 1983) ("Proposed Rule"); see also id. at 11,041 ("Refusal to accept bonds from a surety which is deemed to be non-responsible is a temporary measure designed to protect the Government from cumbersome contracts."), 11,071 ("A major aspect of any revision in the Customs bond system is the extent to which the system can be modernized or streamlined in such a way that costs to the importing community (and ultimately to U.S. consumers) are minimized while still protecting the revenue and other Customs enforcement responsibilities."); Proposed Revision of the Customs Bond Structure and Solicitation of Comments, 46 Fed. Reg. 28,172 (May 26, 1981) ("ANPRM") ("A computerized bond control system would be implemented in conjunction with the Customs bond proposal. . . . The computerized system would provide increased revenue protection and improve the timely availability of information to authorized officials on a 'need to know' basis."). The Final Rule, 49 Fed. Reg. 41,152, implementing CF 301, evidences this intent. Indeed, the summaries of the ANPRM, the Proposed Rule, and the Final Rule each explain: "The purpose of the revision is to simplify transactions between Customs and the importing public and to facilitate establishment of an efficient computerized bond control system." Accordingly Customs is the party intended to be protected, and the national revenue the object to be protected, by the resulting regime. These materials also demonstrate an expectation that private parties would carry a burden to comply with the obligations. See, e.g., Final Rule at 41,160 ("[C]ustodians of Customs bonded merchandise . . . and the other persons who use Customs bonds know what is required of them under the regulations.

While many importers may not be familiar with bond obligations or regulations requirements, they are not filing the entry.  They generally use a broker who is or should be familiar with bond obligations and the regulations.").

Hartford's frequent citations to the OIG Report, see supra n.20, and its phraseology concerning bond defects, are unavailing.  See OIG Report at 5 ("From FY 2007 through FY 2010, CBP has written off $46.3 million in revenue because of inaccurate, incomplete, or missing bonds." (citing 19 C.F.R. § 113.21 (2010)).  As an initial point, in regard to the issue as Hartford frames it before this court, the OIG Report is an opinion document that does not "reflect [Customs'] fair and considered judgment on the matter in question."  Auer v. Robbins, 519 U.S. 452, 462.[29]  Nor does the court take the OIG Report to represent a strict or authoritative interpretation of the Part 113 Regulations.  See Pl.'s Br. at 9.  Rather, it patently represents concern that "major omissions or errors . . . may create collection challenges" or "noncollection."  OIG Report at 5.  This language, as well as the fact that the Report arose from "concerns about alleged deficiencies in U.S. Customs and Border Protection's revenue collection program," id. at 1, only supports the Government's contention that the Part 113 regulatory regime is intended to protect the agency and the national revenue.[30]

Viewing this case through the lens of administrative procedure, the court would also "be most reluctant to conclude that every failure of an agency to observe a procedural requirement

---

[29] The report "is based on interviews with employees and officials of relevant agencies and institutions, direct observations, and review and testing of applicable documents."  OIG Report Preface.

[30] Some of Hartford's other exhibits demonstrate the same.  "Failure to ensure that all data elements are properly completed and verified leaves [Customs] vulnerable to a loss of revenue, as a surety may refuse to insure an improperly filed bond."  Ex. I, cited in Pl.'s Br. at 16 (emphasis added).

voids subsequent agency action, especially when important public rights are at stake."[31]   Great

Am. Ins., 738 F.3d at 1329 (quoting Brock v. Pierce Cty., 476 U.S. 253, 260 (1986)); Dixon

Ticonderoga Co. v. United States, 468 F.3d 1353, 1355 (Fed. Cir. 2006).   Rather, the "great

principle of public policy, applicable to all governments alike, . . . forbids that the public interests

should be prejudiced by the negligence of the officers or agents to whose care they are confided."

Oy v. United States, 61 F.3d 866, 871 (Fed. Cir. 1995) (quoting Brock, 476 U.S. at 260); see

Intercargo Ins. Co. v. United States, 83 F.3d 391, 396 (Fed. Cir. 1996) ("The public interest in the

administration of the importation laws should not 'fall victim' to the [procedural] failure by the

Customs Service . . . if the oversight has not had any prejudicial impact on the plaintiff."); 5 U.S.C.

§ 706.

   The Part 113 regulations are procedural in nature.[32]   "[A] 'critical feature of [a procedural

rule] is that it covers agency actions that do not themselves alter the rights or interests of parties,

although [it] may alter the manner in which the parties present themselves or their viewpoints to

the agency.'"   Tafas v. Doll, 559 F.3d 1345, 1356 (Fed. Cir. 2009) (quoting JEM Broad. Co. v.

---

[31] Counsel for Hartford at oral argument contended that all of the relevant Part 113 regulations, and all of the contents of the CF 301, including the bond instructions from which a number of Hartford's arguments derive, carry the force of law such that their violation voids subsequent agency action, because they were all promulgated through notice and comment procedures.   Oral Arg. Tr. at 35–37.   The argument sweeps too broadly.   Precedent gives no such rule.   That a regulation, or the initial completion instructions on the CF 301, were so promulgated does not necessarily render them mandatory in that sense.   See infra; see also, e.g., Mitsubishi Polyester Film, Inc. v. United States, 41 CIT ___, ___, 228 F. Supp. 3d 1359, 1382 (2017) ([I]nvalidation is not warranted because the time period in [19 C.F.R. § 351.225(c)(2)] is directory, not mandatory, as it does not specify a consequence for failure to comply with the provision." (citing Canadian Fur Trappers Corp. v. United States, 12 CIT 612, 615, 691 F. Supp. 364, 367 (1988), aff'd, 884 F.2d 563 (Fed. Cir. 1989))).

[32] The court restricts its analysis of the procedural nature of Part 113 to only those regulations which are at issue.

FCC, 22 F.3d 320, 326 (D.C. Cir. 1994)), <u>reh'g en banc granted, opinion vacated,</u> 328 Fed. Appx.

658 (Fed. Cir. 2009).[33]   As discussed <u>supra</u>, the regulations are meant to protect Customs in

furtherance of its mission to protect revenue of the United States, and do not clearly alter the rights

of the private parties engaging in the bonding procedure.   The implementation of CF 301, and the

amendment of several Part 113 regulations, in 1984 was intended to:

> (1) modernize the Customs bond structure by reducing and
> consolidating the number of bond forms in use, (2) modify the
> archaic bond language, (3) simplify transactions between Customs
> and the importing community, and (4) facilitate establishment of an
> efficient computerized bond control system . . . .

<u>Final Rule</u> at 41,152.   The regulatory scheme thus "alters the manner in which the parties present

themselves or their viewpoints to the agency" by revising and improving prior bonding procedures.

---

[33] In <u>JEM</u>, the D.C. Circuit reviewed "hard look" rules adopted by the Federal Communications Commission in response to the submission of a significant number of "carelessly prepared and speculative applications" for broadcasting licenses.   22 F.3d at 327.   The D.C. Circuit found those rules "did not change the <u>substantive standards</u> by which the FCC evaluates license applications," but instead "may alter the manner in which the parties present themselves or their viewpoints to the agency," in line with the procedural exception to the notice and comment requirements of the Administrative Procedure Act.   <u>Id.</u> at 326–27 (quoting <u>Batterton v. Marshall</u>, 648 F.2d 694, 707 (D.C. Cir. 1980)); 5 U.S.C. § 553(b)(A) (1988).   Thus, while the hard look rules could result in the loss of substantive rights, they were nonetheless procedural because they did not "foreclose effective opportunity to make one's case on the merits."   <u>Id.</u> at 327–28 (quoting <u>Lamoille Valley R.R. Co. v. Interstate Commerce Comm'n</u>, 711 F.2d 295, 328 (D.C. Cir. 1983)).

The Federal Circuit in <u>Tafas</u> applied the <u>JEM</u> precepts in concluding that four Final Rules promulgated pursuant to notice and comment procedure by the United States Patent and Trademark Office were procedural, as "they govern the timing of and materials that must be submitted with patent applications."   559 F.3d at 1356.   The Rules may "alter the manner in which the parties present . . . their viewpoints" to the agency, said the Federal Circuit, but they do not patently "foreclose effective opportunity" to present patent applications for examination.   <u>Id.</u> (quoting <u>JEM</u>, 22 F.3d at 326, 328).   Like <u>JEM</u> and <u>Tafas</u>, the instant case sees the court reviewing regulations that moderate the contents of an item submitted to an agency for review, the CF 301.   Part 113 simply "alter[s] the manner in which the parties present . . . their viewpoints" to Customs.   <u>JEM</u>, 22 F.3d at 326.   Though the regulatory regime could feasibly "result in the loss of substantive rights," <u>Tafas</u>, 559 at 1356, the intrinsic nature of the scheme as one which moderates private parties' presentation of themselves to the agency cannot be denied.

JEM, 22 F.3d at 326.  Nowhere in the regulatory history behind the implementation of Form 301, or the revision of the corresponding Part 113 Regulations, did Customs provide for the creation of new rights in sureties.  See generally Final Rule; Proposed Rule.

Errors as to procedural rules void subsequent agency action only if they cause the challenging party "substantial prejudice." Am. Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 539 (1970); see Great Am. Ins, 738 F.3d at 1329 ("[T]he suspension in this case could be invalidated only if Great American showed that the agency's procedural error caused it substantial prejudice[.]" (citing Shinseki v. Sanders, 556 U.S. 396, 406 (2009); 5 U.S.C. § 706)); Intercargo Ins., 83 F.3d at 394; PAM S.p.A. v. United States, 463 F.3d 1345, 1348–49 (Fed. Cir. 2006) (holding that a challenger must show substantial prejudice regardless of whether the agency rule confers important procedural benefits).  This is because "[i]t is always within the discretion of . . . an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it." Am. Farm Lines, 397 U.S. at 539.

Insofar as Customs' acceptance of the bonds constitutes violation of a "procedural requirement," Great Am. Ins., 738 F.3d at 1329, Hartford has demonstrated no prejudice caused thereby, and the court can locate no evidence of prejudice in the record.  As a matter of law, "[p]rejudice, as used in this setting, means injury to an interest that the statute, regulation, or rule in question was designed to protect." Intercargo Ins., 83 F.3d at 396.  As stated supra, the regulations are designed to protect Customs, not the surety; Hartford fails to establish otherwise.[34]

---

[34] The court does not, and need not, answer the hypothetical inquiry of whether a surety could demonstrate prejudice as a result of a demand by customs to pay on a bond after an importer principal's default, where the CF 301 in question is completely blank. See Pl.'s Reply at 4 ("The Government does not even rule out the possibility that a blank bond could serve as an enforceable

The record indicates the sum of Hartford's alleged injury is that it had to pay Customs for demands on bonds noncompliant to Part 113, which "Customs should be required to cancel." Pl.'s Br. at 16. The court is unpersuaded that, on this record, this constitutes prejudice. Counsel at oral argument agreed that no prejudice can be shown as to any of the individual bonds, but submitted instead that prejudice to Hartford and sureties generally is of a more abstract, systemic nature. Oral Arg. Tr. at 54–56. Yet the record does not indicate that Hartford lacked in opportunity to stop doing business with the customs brokers on these SEBs, to deny premium payments, or to alert Customs of the defects it now characterizes as fatal. Quite the contrary: over a course of years, JGII, Hartford's general agent, reviewed copies of the SEBs, occasionally contacting brokers to discuss the facial omission of information,[35] and billed the importer principals premium on each of the bonds. Def.'s Facts ¶¶ 6–16, 21, 31, 32, 43; Pl.'s Resp. Facts ¶¶ 6–16, 21, 31, 32, 43. Hartford denies that "in every instance" the Part 2 Surety copy of the CF 301 was returned to JGII for billing premium, but admits both that "for the SEBs at issue in this consolidated case, JGII would bill the premium once it received back from the retail insurance broker the blue, Part 2, surety copy," and that it "does not dispute that premium was paid on each of the sixty-one bonds at issue." Def.'s Facts ¶¶ 21, 31, 32; Pl.'s Resp. Facts ¶¶ 21, 31, 32. JGII had a duty to maintain

---

contract, if Customs can find a discernable intent to contract from extrinsic evidence."); Oral Arg. Tr. at 190–91.

[35] In response to the government's assertion that, "[i]f Mr. Gorman or his JGII staff saw an error or omission on a surety copy of a bond, Mr. Gorman would call the customs broker to complain about the manner in which the bond was completed and then bill premium on that bond," Hartford "[a]vers that Mr. Gorman testified he called customs brokers a couple of times to complain about the manner by which they were completing the bond, but only if Gorman discovered a pattern of a specific error common to multiple bonds issued by that customs broker." Def.'s Facts ¶ 43; Pl.'s Resp. Facts ¶ 43. The regularity with which Gorman called the relevant customs broker to complain about their procedure does not alter the undisputed fact that Hartford through its agent had the ability and opportunity to complain.

complete copies of all bonds under its agency agreement, yet Hartford had no formal policy or procedure for reviewing whether the agent was complying with the GAA.  Def.'s Facts ¶¶ 12, 13; Pl.'s Resp. Facts ¶¶ 12, 13; GAA at Art. VII.  Thus, altogether, Hartford does not convincingly explain how specifically it was prejudiced here, in the pertinent sense, by Customs' acceptance of bonds noncompliant with Part 113, where the charges on the suretyship obligation arise from the importer principals' defaults regardless of technical compliance.

In summary, in determining that the SEBs here are not void, the court is persuaded by:  a lack of promulgated consequences for noncompliance; language regulating bond content and presentation of parties to the agency rather than agency behavior; regulatory history showing intent to protect Customs and not to create important substantive rights in private parties; and a lack of substantial prejudice suffered by Hartford.  Customs' acceptance of the SEBs at issue in this case did not void them under the Part 113 regulations.

IV.      Whether the SEBs are Enforceable Contracts

A.  Parties' Arguments

Hartford argues that even if the bonds are valid under the Part 113 regulatory regime, many of the bonds are regardless unenforceable for lack of essential terms under "traditional principles of contract law."  Pl.'s Br. at 19.  Hartford points to the necessity of sufficient definitiveness granted by essential terms which create a binding contract.  Id. (citing RESTATEMENT (SECOND) OF CONTRACTS § 33 (AM. LAW INST. 1981) ("Restatement of Contracts")).  Citing United States v. Boecker, 88 U.S. 652 (1874), Hartford argues that the lack of an essential term, such as an address, removes a surety from liability.  Pl.'s Br. at 20.  Hartford also argues, on the basis of Bell & Grant v. Bruen, 42 U.S. 169 (1843), that "[s]urety bond contracts are strictly construed in favor of the surety and only bind the surety to the obligation it clearly intended to assume."  Pl.'s Br. at 20.

The essential contract terms here implicated, as selected by Hartford, include "the identification of the particular transaction (the entry number),[36] the transaction date, and the limit of liability/penal sum of the bond." Pl.'s Br. at 21. Hartford argues these terms encompass the "letter, spirit, or meaning of the bond," Boecker, 88 U.S. at 656, and circumscribe the surety's obligations. Pl.'s Br. at 21 (citing Miller v. Stewart, 22 U.S. 680, 702–03 (1824)). In summary, Hartford asserts that Customs' acceptance of SEBs lacking these essential terms rendered Hartford's obligations "open and undefined," and thus deprived the SEBs of validity and enforceability. Id.

Hartford alternately argues that the SEBs are rendered unenforceable for failure to satisfy the "Statute of Frauds."[37] Pl.'s Br. at 19, 22. Hartford quotes the RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY, ch. 2, § 11 (AM. LAW INST. 1996) ("Restatement of Suretyship"), for the proposition that "[p]ursuant to the Statute of Frauds, a contract creating a secondary obligation is unenforceable as a contract to answer for the duty of another unless a written memorandum satisfying the Statute of Frauds or an exception applies."[38] Pl.'s Br. at 22. Hartford defines "written memorandum" according to the Restatement of Contracts § 131:

---

[36] The "entry number," in this context, is a value appearing on the face of the CF 301. It is titled in full as "Identification of transaction secured by this bond (e.g., entry no., seizure no., etc.)." CF 301. The entry number should not be confused with the "SEB number" found at the bottom of each bond in this case, used by Hartford as a unique identifier to aid in billing. Def.'s Facts ¶¶ 30, 33; Pl.'s Resp. Facts ¶¶ 30, 33.

[37] Hartford levies statute of frauds arguments as to all remaining bonds at issue. Compl. ¶¶ 96, 102–07, 114, 120–24, 128, 131–38, 146, 149–56, 166, 170–77, 185, 188–95, 203, 207–14, 221, 225–33, 240, 244–52, 259, 263–70.

[38] Hartford notes that this Court has referred to the Restatement of Suretyship in determining the rights and obligations of parties under customs bonds in other cases. Pl.'s Br. at 22 n.18 (citing United States v. Great Am. Ins. Co. of NY, 35 CIT ___, 791 F. Supp. 2d 1337 (2011), aff'd in part, rev'd in part, Great Am. Ins., 738 F.3d 1320).

Unless additional requirements are prescribed by the particular
statute, a contract within the Statute of Frauds is enforceable if it is
evidenced by any writing, signed by or on behalf of the party to be
charged, which

(a) reasonably identifies the subject matter of the contract,
(b) is sufficient to indicate that a contract with respect thereto
has been made between the parties or offered by the signer
to the other party, and
(c) states with reasonable certainty the essential terms of the
unperformed promises in the contract.

Hartford asserts that "Congress or an agency can also impose a Statute of Frauds in specific

areas," Pl.'s Br. at 23, and that, per the United States Court of Federal Claims, regulations impose

a statute of frauds if they are "explicit in requiring that every contract . . . 'be reduced to writing,

and signed by the contracting parties.'" Lublin Corp. v. United States, 84 Fed. Cl. 678, 686 (Fed.

Cl. 2008).   That established, Hartford argues that Customs' regulations–19 C.F.R. §§ 113.11,

113.21, 113.33, and 113.37, as well as the CF 301 itself–collectively impose such a statute of

frauds, as they function to demand a signed writing containing essential terms. Pl.'s Br. at 23.

Hartford concludes with a tetrapartite argument that Customs cannot look to extrinsic

evidence to repair deficient contracts, first because the SEBs are statutory bonds, promulgated

pursuant to 19 U.S.C. §§ 66, 1623, and thus are contingent upon compliance with all applicable

statutes and regulations.  Pl.'s Br. at 24 (citing United States v. DeVisser, 10 F. 642, 648 (S.D.N.Y.

1882)).    Hartford asserts second that "the SEBs expressly incorporate the custom bond

regulations," and thus regulatory requirements must be satisfied for bond enforceability.  Id. at 25

(citing Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1057 (Fed. Cir. 2012); S. Cal.

Edison Co. v. United States, 226 F.3d 1349, 1353 (Fed. Cir. 2000)).   Hartford appears to argue

that, because, under its reading, the Part 113 regulations are incorporated into CF 301, the

regulatory regime broadly "requires that each bond constitutes the complete and final contract

between the parties."  Id.  Third, Hartford argues that the Federal Circuit in Sun Studs, Inc. v.

Applied Theory Assocs. Inc., 772 F.2d 1557 (Fed. Cir. 1985), "rejected Customs' argument that

extrinsic evidence can be used to correct an incomplete or deficient contract."  Pl.'s Br. at 25.

According to Hartford, the Court in that case held that a signed transmittal letter could not cure a

deficiency in the operative settlement agreement between the parties, which was void for lack of

a party's signature.  Id.  Finally, Hartford reasserts that "no statutes or regulations authorize

Customs' use of extrinsic evidence to 'complete' bonds that are otherwise missing essential

information."  Id. at 26 (citing Ingalls Dep. at 38–39, 279–80).

The Government argues that the bonds are valid contracts.  Def.'s Br. at 21.  Preliminarily,

the Government asserts that when applying ordinary principles of contractual interpretation to

determine whether a contract exists, NRM Corp. v. Hercules, Inc., 758 F.2d 676, 681 (D.C. Cir.

1985), a court should look to context, per Restatement of Contracts § 212 cmt. b, and also extrinsic

evidence.  Def.'s Br. at 21.  The Government states generally that under "long-standing principles

of contract interpretation," Customs was entitled to rely on other documents in the entry package

to assess contractual intent between the parties.[39]  Id.  at 22.

_____

[39] The Government argues that reformation could apply where "a mistake of both parties as to the
contents or effect of the writing" results in an imperfectly expressed agreement.  Def.'s Br. at 21
(citing Restatement of Contracts § 155).  The Government also argues that Hartford ratified all the
bonds and is thus liable on them regardless of whether missing information on the face of an SEB
would remove a surety's liability.  Def.'s Br. at 28 (quoting RESTATEMENT (SECOND) OF AGENCY
§ 82 (AM. LAW INST. 1958), quoted in Schism v. United States, 316 F.3d 1259, 1289 (Fed. Cir.
2002)).  The Government asserts that "[a]ccepting the benefits from the acts of an apparent agent
confirms the agent's authority and will estop a principal from denying the obligations flowing
from the acts."  Id. (citing RESTATEMENT (THIRD) OF AGENCY § 4.01 cmt. b (AM. LAW INST. 2006)
("Restatement of Agency") ("The sole requirement for ratification is a manifestation of assent or
other conduct indicative of consent by the principal.")).

Hartford counters by arguing, first, that neither the customs broker on each bond nor
Customs acted as agents of Hartford.  Pl.'s Reply at 16 (citing Restatement of Agency § 4.03).
Hartford second argues that ratification is absent because "Hartford lacked actual knowledge of
the defects in the bonds accepted by Customs," thus falling short of the standard in Restatement

The Government notes in its Reply that Gorman never stopped doing business with customs brokers who failed to comply with the Customs regulations, Pl.'s Resp. Facts ¶¶ 46, 47, that Hartford never alerted a principal that it believed any bonds containing errors were unenforceable, id. ¶ 50, and that Hartford never refunded the premium to any principals on supposedly defective bonds, id. ¶ 52. Def.'s Reply at 10–11. The Government too disputes Hartford's claim that complete and accurate bonds increase the likelihood that Customs will collect from the importer, Pl.'s Reply at 8–9, since the construction of a bond does not affect the likelihood that an importer will be called upon for payment. Def.'s Reply at 11. The Government stresses that the Part 113 regulations exist to "insure that the revenue is adequately protected," 19 C.F.R. § 113.11 (2016), not to protect the surety. Def.'s Reply at 12.

B. Analysis

The SEBs are valid and enforceable contracts between Customs, the importer principals, and Hartford. In evaluating the documents at issue under the circumstances produced by the parties, the court applies ordinary principles of contract construction as would be applicable to any contract action between private parties. United States v. Winstar Corp., 518 U.S. 839, 870–71 (1996); Priebe & Sons v. United States, 332 U.S. 407, 411 (1947). Thus the court's duty in

---

of Agency § 4.06. Pl.'s Reply at 16–17. As to mutual mistake and reformation, Hartford argues that there was not, and exists no record evidence of, a mistake of fact in Customs' acceptance of the SEBs, which, it asserts, would be required under Restatement of Contracts § 155. Pl.'s Reply at 19; see Nat'l Austl. Bank v. United States, 452 F.3d 1321, 1329 (Fed. Cir. 2006).

    In its Reply, the Government adds that the customs brokers who completed the SEBs did so with the approval of and based on instructions from JGII, Pl.'s Resp. Facts ¶¶ 38, 41, and that JGII's General Agency Agreement with Hartford permitted the former to delegate authority and obligations to sub-producers who were licensed customs brokers. GAA at Art. V. Here, the Government argues, JGII delegated authority to the customs brokers when it provided pre-signed bonds to them; therefore, they were agents of Hartford, who "exercised sufficient control over the customs broker to support a finding of agency." Def.'s Reply at 14.

    As explained infra, the court does not reach these arguments.

construing the contracts at issue is to give effect to the mutual intentions of the parties.  See NRM

Corp., 758 F.2d at 681.

    1.  The Appendix 1, 2, 4, and 6 SEBs

    The court first considers contractual principles regarding alleged defects common to the

SEBs in Appendices 1, 2, 4, and 6 before scrutinizing each alleged defect.   Hartford's

unenforceability argument focuses largely on formation, or rather lack thereof due to absence of

allegedly essential terms on the bonds.[40]  Pl.'s Br. at 19.  On a suretyship agreement, the offeror is

typically the surety, as is Hartford here.  See Hartford Fire Ins. Co. v. United States, 36 CIT ___,

___, 857 F. Supp. 2d 1356, 1362 (2012) ("Hartford II") ("Customs' acceptance of the surety's

---

[40] As the court has noted, despite Hartford's instant arguments, it both billed and accepted premium
through its general agent JGII, who reviewed Part 2 surety copies, on every bond in this case,
including those which it alleges were not reasonably certain and did not contain essential terms
"which define the scope of liability and the subject matter of the contract."  Pl.'s Br. at 19.  The
court considers the validity of the bonds identified in this section under principles of contract law,
but as a matter of equity, Hartford could well be estopped from asserting non-formation and
unenforceability after having behaved as if the bonds are enforceable by billing and accepting
premium.  See, e.g., Am. Sur. Co. of N.Y. v. City of Akron, 95 F.2d 966, 969 (6th Cir. 1938)
("[T]he acceptance of renewal premiums by the sureties of the Central Bank from the successor
bank constituted recognition of the successor bank as principal, and estopped such sureties from
denying liability under their bonds. . . . We think this ruling is correct.").  By the same token, the
court is not persuaded by any argument that Hartford relied on Customs to approve only compliant
bonds in the formation of a valid and enforceable contract.  See Pl.'s Reply at 12 ("Hartford and
other sureties relied on the benefits to them that arise from having only compliant bonds approved,
and that potential benefit was a condition of Hartford's agreement to act as surety. To the extent
Customs approved non-compliant bonds, . . . Hartford's intent to contract was never consummated
and an enforceable contract against Hartford was never created.") (emphasis added).  Insofar as
Hartford is claiming that technical correctness in the CF 301 is "a condition of Hartford's
agreement to act as surety," Pl.'s Reply at 12, that condition was waived here by Hartford's
awareness that Customs approved bonds that Hartford believed contained errors, JGII's review of
Part 2 Surety copies of the multiform CF 301, and its subsequent billing and acceptance of
premium from principal importers on each bond.  See Pl.'s Resp. Facts ¶¶ 38, 41, 43, 44;
Restatement of Contracts § 246(1) ("[A]n obligor's acceptance or his retention for an unreasonable
time of the obligee's performance, with knowledge of or reason to know of the non-occurrence of
a condition of the obligor's duty, operates as a promise to perform in spite of that non-occurrence
. . . .").

offer is necessary to the formation of the surety agreement." (citing Restatement of Suretyship § 8 cmt. a ("An offer to become a secondary obligor[41] commonly invites the offeree to accept by advancing money, goods, or services on credit."))). The facts clearly show that Hartford, as secondary obligor, manifested its willingness to contract with Customs, as obligee,[42] on these SEBs by becoming the surety to multiple principals across the operative three-year time period, December 1, 2003 through December 31, 2006.  Compl. Appendices 1–6; Restatement of Contracts § 24 ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.").  The basic entry bond conditions, 19 C.F.R. § 113.62(a)(1)(ii), which are expressly "incorporated by reference into the bond," § 113.61, require that the importer and surety jointly and severally agree to "[p]ay, as demanded by Customs, all additional duties, taxes, and charges subsequently found due, legally fixed, and imposed on any entry secured by this bond."  Other facts in the record establish a course of dealings which allow the court to characterize Hartford's conduct in each case as the making of an offer, to Customs, to become secondary obligor: Hartford's relationship with JGII, memorialized in the GAA, began on or about September 4, 2002, more than a year before the first of the SEBs at issue were submitted to Customs, and was renewed almost a year into that process, on or about September 3, 2004, Hartford Dep. at 15, 18; during the operative time, JGII distributed pre-printed bonds to retail insurance brokers, containing Gorman's facsimile signature, Def.'s Facts ¶¶ 15, 28, Pl.'s Resp. Facts ¶¶ 15, 28; and Hartford operated a

---

[41] An obligor is "[s]omeone who has undertaken an obligation; a promisor or debtor."  Obligor, BLACK'S LAW DICTIONARY (10th ed. 2014).

[42] An obligee is "[o]ne to whom an obligation is owed; a promisee, creditor, or donor beneficiary." Obligee, BLACK'S LAW DICTIONARY (10th ed. 2014).

complicated business outfit, in which the bonds issued through JGII included the surety's preprinted billing identification number, printed in specific locations on chemically designed, multi-part CF 301 forms, to aid in the collection of premium.  Hartford Dep. at 31–34, 38–41; CF 301; Def.'s Facts ¶¶ 27, 42; Pl.'s Resp. Facts ¶¶ 27, 42; see Restatement of Contracts § 223(1) ("A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.").

An offer to contract cannot be accepted unless the terms of the contract are reasonably certain.  Restatement of Contracts § 33(1); see Pac. Gas & Elec. Co. v. United States, 838 F.3d 1341, 1355–56 (Fed. Cir. 2016), petition for cert. filed, (U.S. July 6, 2017) (No. 17-57). Reasonably certain terms must provide a basis for determining the existence of breach and for giving an appropriate remedy.  Restatement of Contracts § 33(2).  Generally, the court may look to factual implication to supply missing terms.  Restatement of Contracts § 33 cmt. a.  The court may also look to other writings to supply missing terms, as "all writings that are part of the same transaction are interpreted together."  Id. § 202(2).  "'[A] contract may arise as a result of the confluence of multiple documents' so long as there is 'a clear indication of intent to contract[,] and the other requirements for concluding that a contract was formed' are met." Suess v. United States, 535 F.3d 1348, 1359 (Fed. Cir. 2008) (quoting D & N Bank v. United States, 331 F.3d 1374, 1378 (Fed. Cir. 2003)).  The facts show that the multiple Customs Forms in the entry package are memoranda of the same transaction.  Def.'s Exs. 1–6; CF 7501; CF 3461;[43] Gorman Dep. at 77, 124–25.  Applicable regulations bind these documents together into the entry package.  See 19

---

[43] As stated supra nn.2–3, every bond under scrutiny in this section was accompanied by both a CF 3461 and a CF 7501 in its respective entry package.

C.F.R. §§ 142.11(a) (2003) ("The entry summary shall be on Customs Form 7501 unless a different

form is prescribed elsewhere in this chapter."), 142.3 (2003) (requiring CF 3461 unless the

merchandise is imported from a contiguous country or the entry summary is filed at the time of

entry), 142.4 (2003) ("[M]erchandise shall not be released . . . [when] Customs receives the entry

documentation or the entry summary documentation which serves as both the entry and the entry

summary . . . unless a single entry or continuous bond on Customs Form 301 . . . has been filed.").

"Words and other conduct are interpreted in the light of all the circumstances," Restatement of

Contracts § 202(1), and the submission of an entry package containing information also absent

from the face of one constituent element of that package does not preclude the court from

ascertaining the parties' intent to contract in each case.  The court perceives no reason, and sees

no convincing argument, that consistent additional terms cannot be applied to the SEBs by virtue

of the context surrounding each transaction.  See id. § 204.

     Having outlined these applicable principles, the court analyzes in turn the alleged defects

identified by Hartford as constituting essential contract terms.  Pl.'s Br. at 19.

     a.  The Principal's Signature

     In formulating its argument as to missing "essential terms--which define the scope of

liability and the subject matter of the contract," Hartford does not include signatures.  Pl.'s Br. at

19.  Yet, earlier in its motion, Hartford appears to imply that signatures are terms essential to

formation and enforceability.  See Pl.'s Br. at 1 ("[A] bond must include certain essential terms,

e.g., . . . the 'entry number' . . . the 'transaction date' . . . the 'penal sum' . . . and the

identification and signature of the parties, in order to be enforceable.").  To the extent that

Hartford implies the bonds are invalid contracts because the absent signatures are essential terms,

the court analyzes that contention.

Found in Appendices 1 and 4, the seven SEBs lacking a principal's signature, or the

signature of its attorney-in-fact customs broker,[44] were submitted by the customs broker on behalf

of the importer as an element of the entry package, thus demonstrating the principal's intent to be

bound.  See 19 C.F.R. § 142; Pl.'s Ex. G (stating the intent, via their respective customs brokers,

of Farmland [as to the six Appendix 4 bonds], SCS marketing [as to the single Appendix 6 bond],

and Fasttrack Merchants, Inc. [as to one of the Appendix 1 bonds], to "be bound to the terms of

the bond").   The entry package for each of these SEBs contained both a CF 7501, signed by the

customs broker on behalf of the importer, and a CF 3461, documents which require affirmations

from importers or their attorneys-in-fact.  Def.'s Exs. 1, 4; see CF 7501 at 1 ("I declare that I am

the . . . importer of record . . . . I also declare that the statements in the documents herein filed . . .

are true and correct . . . ."); CF 3461 at 1 ("I certify that the above information is accurate, the bond

is sufficient, valid, and current, and that all requirements of 19 CFR Part 142 have been met."); 19

C.F.R. § 142.4.  To the extent that the principal's signature represents an intent to be bound, that

intent is clear from the facts surrounding each of the seven bonds.  See Restatement of Contracts

§ 24.

   b.   The Date of Transaction

Two bonds, one found in Appendix 1 and the other in Appendix 4, lack the date of

transaction.[45]  As to formation, the "date of transaction" value characterizes the surety's offer, and

---

[44] In Appendix 1:  SEB0431814 covering entry ARV-0661848-7; SEB0431632 covering entry
ARV-0661754-7; SEB0431846 covering entry ARV-0662172-1; and SEB0372602 covering entry
ARV-0662370-1.   In Appendix 4:  SEB0431564 covering entry 038-0608659-5; SEB0431563
covering entry 038-0608658-7; SEB0431565 covering entry 038-0608657-9.

[45] In Appendix 1: SEB0372602 covering entry ARV-0662370-1. In Appendix 4:  SEB0431563
covering entry 038-0608658-7.

functions to invite acceptance from Customs.  See 19 C.F.R. § 113.26(b) ("A single transaction bond is effective on the date of the transaction identified on the [CF 301]."); Hartford II, 857 F. Supp. 2d at 1362 n.5 ("[T]he effective date of the bond instrument is not the same as formation. The effective date tells Customs that a bond offer is outstanding and invites Customs acceptance by entering the goods, thereby creating the obligation that is the subject matter of the bond."); Restatement of Contracts §§ 24, 32.  This reading is further supported by the customs broker's certification on each entry package's signed and dated CF 3461 Entry/Immediate Delivery form that "the bond is sufficient" and that "all requirements of 19 CFR Part 142 have been met."  Def.'s Exs. 1, 4; CF 3461.  As explained supra, the circumstances surrounding each bond's entry show that Customs accepted a sufficiently certain suretyship offer, negating any contention that a missing "date of transaction" itself vitiates the contract.

     c.  The Entry Number

     The entry number is missing from five of the bonds, four of them found in Appendix 1 and the fifth found in Appendix 2.[46]  Each of these bonds was accompanied by a CF 7501 containing the entry number.[47]  Hartford nowhere alleges that as a matter of fact, it is unclear which CF 7501 matches which entry package and bond.

     Hartford generally has not demonstrated, on the facts before the court, that these pieces of data are material to the SEBs such that their absence blocks formation for uncertainty, see

---

[46] In Appendix 1: SEB0431814 covering entry ARV-0661848-7; SEB0431632 covering entry ARV-0661754-7; SEB0431846 covering entry ARV-0662172-1; and SEB0372602 covering entry ARV-0662370-1.  In Appendix 2: SEB0144529 covering entry 316-0604450-6.

[47] The CF 301 is stapled to the remaining entry documents, clearly covering the given entry.  Def.'s Attach. 1 at 1–3.  Moreover, the unique identification SEB number on each bond, a value separate from the entry number and preprinted by Hartford's commercial vendor, appears on each relevant Appendix 1 bond's respective CF 7501.  See Def.'s Ex. 1.

Restatement of Contracts § 33, or enforceability for any other doctrinal reason.  Quite the contrary: Hartford indisputably accepted premium on each bond, the billing for which required review of copies of the bonds by JGII, Hartford's general agent.  The offer to contract as to each bond identified by Hartford thus having been reasonably certain, Customs' acceptance of those offers formed valid contracts.  See Hartford II, 857 F. Supp. 2d at 1362 ("Customs' approval [of the bond] functions as an acceptance necessary to formation of the contract . . . ."); Restatement of Contracts § 50(1)[48] ("Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.").

Hartford's case law citations are unavailing.  In Boecker, 88 U.S. 652, the Supreme Court held that the United States could not recover against a surety for the principal's default on taxes owed on his distillery at a particular location, when the bond incorrectly identified the distillery as having a different location in the same town.  The Court opined that "this term of the bond is of the essence of the contract," and because the locative term characterized the surety's liability, "[t]here could consequently be no liability within the letter or meaning of the contract."  Boecker, 88 U.S. at 656.  Here, by contrast, there was no confusion as to Hartford's liability that would have prevented formation; its liability was limited to the bond's penal sum, and even assuming that the date of transaction and the entry number went to the spirit of Hartford's suretyship obligation, they were readily ascertainable in the context of each entry.  Interstate Rock Products, Inc. v. United States, 50 Fed. Cl. 349 (Ct. Cl. 2001), aff'd per curiam, 48 Fed. Appx. 331 (Fed. Cir. 2002), meanwhile speaks to enforceability of a bond that lacked a penal sum.  Pl.'s Br. at 20–21.  As

---

[48] See also id. § 50(2) ("Acceptance by performance requires that at least part of what the offer requests be performed or tendered and includes acceptance by a performance which operates as a return promise.").

explained <u>supra</u>, the court does not have jurisdiction over the sole bond in this case lacking a penal

sum certain, SEB0137067 covering entry JN7-0332527-2.[49]

In summary, as the facts in the record show, the contracts are sufficiently definite with

respect to the essential terms, as Hartford characterizes them, being present either on the face of

the SEBs or in the entry package, such that the court can ascertain with certainty the identities of

the contracting parties, their intent, and their obligations.  <u>See</u> Pl.'s Ex. G; Def.'s Exs. 15, 16;

<u>compare</u> <u>Pac. Gas</u>, 838 F.3d at 1356 ("There is no basis here for determining the groups that are

supposed parties to the contracts at any particular time or the particular obligations that each group

owes to the other. . . . [or] the duration or other material terms of the alleged agreement(s).  The

certainty required for the existence of a contract is simply lacking.").

   2.  The Appendix 5 Bonds

The two Appendix five bonds[50] are sui generis in that they lack Hartford's signature as

surety on the bond.[51] [52]   Unlike all other bonds under consideration, these bonds are represented

---

[49] Under the circumstances here, the court need not, and does not, opine on the essential nature of a bond's penal limit as a matter of contract law.

[50] SEB 0421676 covering entry ES2-0053112-8; SEB033[]379 covering entry ES2-0041927-4.

[51] As with those bonds lacking the principal's signature, <u>see</u> <u>supra</u> Section IV.B.1.a., Hartford largely predicates the unenforceability of these two bonds on the premise that the statute of frauds bars surety contracts not signed by both parties.  Pl.'s Br. at 19, 23 ("The U.S. Court of Federal Claims has explained that statutes or regulations impose a Statute of Frauds if they are 'explicit in requiring that every contract . . . be reduced to writing, and signed by the contracting parties.'" (quoting <u>Lublin Corp.</u>, 84 Fed. Cl. at 686)).  The court likewise analyzes these bonds, to the extent that Hartford argues the bonds are invalid contracts because the lack of a principal's signature robs them of certainty.  <u>See</u> Restatement of Contracts § 33.

[52] As explained in regard to bonds in the other appendices, <u>supra</u> n.40, Hartford may well be estopped from arguing unenforceability of a contract on which it has accepted premium; the court again resolves the question of formation and enforceability as a matter of law.

by "Part[s] 3 – Principal" copies.  Def.'s Ex. 5.  Neither party is able to furnish Parts 1 of the two

bonds or explain why Customs was in possession of Parts 3, rather than Parts 1. Oral Arg. Tr. at

90–91, 93–96, 181–83.   Nonetheless, the court finds that summary judgment remains appropriate

as to these bonds.  Any potential factual dispute regarding their origin and procession through the

bonding process is not material because it would not change the outcome of the court's analysis.

See Liberty Lobby, 477 U.S. at 249–50.

        The  lack  of  Hartford's  signatures  on  these  bonds  does  not  defeat  formation  or

enforceability.   Hartford cannot plausibly argue on the facts in the record that it did not intend to

contract on these bonds, [53] being that it billed and received premium on them. Def.'s Facts ¶ 21;

Pl.'s Resp. Facts ¶ 21.  A surety that bills premium signals that it is the surety on the instrument in

question.  See Restatement of Contracts § 19(1) ("The manifestation of assent may be made wholly

or partly by written or spoken words or by other acts or by failure to act.").  Hartford's efforts to

avoid its responsibilities under the bonds are defeated by its performance, namely, its acceptance

of premiums.   See id. §§ 389(2) ("The power of a party to avoid a contract for mistake or

misrepresentation is lost if after he knows or has reason to know of the mistake or of the

misrepresentation if it is non-fraudulent . . . he manifests to the other party his intention to affirm

it."), id. cmt. a ("[T]he affirming party is bound as from the outset and the other party continues to

---

[53] Even were Hartford to affirmatively contend it was unaware that these bonds were being
distributed, Hartford in that scenario would simply be the recipient of an offer, by the customs
broker, to serve as secondary obligor on each of the two bonds.  See Restatement of Contracts §
24.  Hartford could have rejected this offer, id. § 38, but instead accepted it by billing importers
premium.  Id. at §§ 19(1) ("The manifestation of assent may be made wholly or partly by written
or spoken words or by other acts or by failure to act."), 22, 30.  Hartford then billed and retained
premium.  Def.'s Facts ¶ 43, 52; Pl.'s Resp. Facts ¶ 43, 52.  Customs was the beneficiary of these
bonds.  See Sioux Honey, 672 F.3d at 1057 ("The contracts also incorporate federal regulations
indicating that the Government is the beneficiary." (citing 19 C.F.R. § 113.62)).

be bound."), 246 ("[A]n obligor's acceptance or his retention for an unreasonable time of the

obligee's performance, with knowledge of or reason to know of the non-occurrence of a condition

of the obligor's duty, operates as a promise to perform in spite of that non-occurrence . . . .").

3.  The Statute of Frauds

Hartford's statute of frauds argument too is unavailing.  The court is not persuaded by the

proposition that a constellation of regulatory and statutory dictates implicitly imposes a common

law statute of frauds, Pl.'s Br. at 23, where neither Congress nor the agency has explicitly made

that declaration.  See Lublin Corp., 84 Fed. Cl. at 686 ("Certainly, Congress knows how to write

a statute of frauds, if it wants to[.]").  Indeed, the court reads Lublin Corp. not to suggest that the

ability of Congress to impose a statute of frauds means that one is so imposed where the legislative

structure at issue enumerates requirements resembling those of the statute of frauds as defined in

the Restatement of Contracts § 110, as Hartford argues.  Pl.'s Br. at 23.  Rather, the court looks at

the analysis clearly provided in that opinion, which advises against searching for "some sort of

stealth statute of frauds" that would "reinstate in looser terms the very explicit statute of frauds

that had been repealed in 1941." 84 Fed. Cl. at 686–87 (referring to Act of June 2, 1862, § 1, 12

Stat. 411 (repealed 1941)).  The court applies that same reasoning to agency rulemaking, and

reiterates the impropriety of finding that a regulatory regime "obliquely imposes a federal statute

of frauds." Id. at 688.

"[T]he Federal law of Government contracts dovetails precisely with general principles of

contract law."  NRM Corp., 758 F.2d at 681 (citation omitted).  That being said, contrary to

Hartford's arguments, in no way do the relevant Part 113 regulations "and CF 301 itself, expressly

incorporate a statute of frauds."  Pl.'s Br. at 23.  While pointing to the platonic ideal of the statute

of frauds found in Restatement of Contracts § 110, Hartford presents no text in either the

regulations or CF 301 expressly incorporating it or any statute of frauds.  Pl.'s Br. at 22–24.  The

court will not place a common law gloss upon a federal regulatory regime by finding additional

requirements, absent textual support, and particularly not where those regulations are procedural

and directory.[54]   See City of Milwaukee v. Ill. & Mich., 451 U.S. 304, 319 (1981) ("The

establishment of such a self-consciously comprehensive program by Congress . . . strongly

suggests that there is no room for courts to attempt to improve on that program with federal

common law.").

The court, having found the SEBs to be valid and enforceable contracts as a matter of law,[55]

need not consider the Government's arguments as to mutual mistake, reformation, and a principal's

---

[54] Hartford's argument as to the statute of frauds appears initially as a rephrasing of its primary
contractual argument, which is that certain of the SEBs at issue lack essential terms stated with
reasonable certainty, and are thus unenforceable under general principles of contract law.  Pl.'s Br.
at 22–24 (citing Restatement of Contracts § 131(c) (noting that a signed writing satisfying the
statute of frauds must "state[] with reasonable certainly the essential terms of the unperformed
promises in the contract.")).  However the thrust of this argument is in alleging bond invalidity as
a technical matter, rather than as one which goes to the question of whether the court can ascertain
the contracting parties' intent in light of certain missing terms.  Id. at 24 ("Because the SEBs were
not signed by the parties and/or were missing essential terms, they fail to comply with the Statute
of Frauds, and are therefore unenforceable.").  Yet even viewing the statute of frauds as a creature
of the Restatement, the framework therein permits satisfaction of the statute by reference to
multiple simultaneous writings, which would be available to the court's analysis in each case in
the form of the entry package documents that accompanied the SEBs at the time of acceptance.
Restatement of Contracts § 132 ("The memorandum may consist of several writings if one of the
writings is signed and the writings in the circumstances clearly indicate that they relate to the same
transaction.").  Therefore in addition to its reticence to impse procedural requirements uncalled for
by the regulatory text or directly applicable principles of contract law, the court here declines to
endorse an argument emphasizing technical failures over substantial contractual principles, in
seeming contradiction of the ancient maxim that the law abhors a forfeiture.

[55] See generally Restatement of Suretyship §§ 71(1) ("A legally mandated bond is a secondary
obligation required by law . . . .  The law requiring the secondary obligation may be legislation,
administrative act or regulation, or court rule."), 72 ("When the law requiring a legally mandated
bond . . . also requires either that . . . (b) the secondary obligation be in a particular form . . . the
fact that such requirements were not fulfilled is not a defense to the secondary obligation.").

ratification of its alleged sub-agent's actions.  Def.'s Br. at 21–23, 28–32 (citing Restatement of

Agency § 4.01); Def.'s Reply at 12–15 (citing Restatement of Agency § 101).

V.      Impairment of Hartford's Suretyship Rights

A.  Parties' Arguments

Hartford argues that should the court remain unpersuaded by its prior arguments, it is still

entitled to summary judgment because Customs "impaired Hartford's suretyship rights by

accepting defective bonds."  Pl.'s Br. at 27.  Citing the Restatement of Suretyship, Hartford

characterizes Customs' acceptance of facially deficient bonds as an act that "impaired Hartford's

recourse against importers," id., because it  "increases the secondary obligor's risk of loss by

increasing its potential cost of performance or decreasing its potential ability to cause the principal

obligor to bear the cost of performance."  § 37(1).  Hartford asserts that "[d]ue to Customs' errors

and omissions in accepting defective SEBs, if Hartford tried to pursue action against the

importer/principals," in order to achieve subrogation, "the company would not be able to recover

the amounts it is owed."  Pl.'s Br. at 29 (citing Restatement of Suretyship § 27).  Hartford contends

that to the extent acceptance of those bonds by Customs, the obligee, would cause the surety a loss,

the surety may be discharged from its obligation.  Restatement of Suretyship § 44.

In its Reply, Hartford disputes the applicability of the doctrine of sovereign immunity to

block Hartford's impairment of suretyship claim, as the Government argues it does.  Pl.'s Reply

at 30; Def.'s Br. at 32.  Hartford characterizes the Government's chief-case in that regard,

Lumbermens Mut. Cas. v. United States, 654 F.3d 1305 (Fed. Cir. 2011), as standing not for the

proposition that sovereign immunity blocks all impairment of suretyship claims against the United

States, but rather for a construction of the Tucker Act, 28 U.S.C. § 1491 (2006), which waives

sovereign immunity over any express or implied contracts between the government and the suing

party, as disallowing suits over "implied-in-law contract[s]." Pl.'s Reply at 30–31. By contrast, Hartford argues, the instant case finds a waiver of sovereign immunity in 28 U.S.C. § 1581(a), the court's jurisdictional provision, which waives sovereign immunity for denied protests that challenge Customs' charges or exactions. Id. Hartford cites Hartford I, 544 F.3d at 1293, to assert that challenges against a bond's enforceability are based on common law surety and contract theories, and are subject to protest under 19 U.S.C. § 1514(a)(3). Pl.'s Reply at 31. Thus its claim is simply a "theory of defense" to a charge, which may be brought under § 1514(a)(3).

The Government argues that claims for impairment of suretyship against the United States are barred by the doctrine of sovereign immunity. Def.'s Br. at 32 (citing Lumbermens, 654 F.3d at 1316–17; Hartford II, 857 F. Supp. 2d at 1369). In its Reply, the Government argues that the Federal Circuit's recognition, 544 F.3d at 1293–94, of the protestability, under 19 U.S.C. § 1514(a)(3), of a surety's claims regarding bond unenforceability, even if based on common law surety and contract law theories, does not also mean that the United States has waived sovereign immunity, through 28 U.S.C. § 1581, as to claims for impairment of suretyship with respect to a Customs bond. Def.'s Reply at 18. The Government emphasizes that a waiver of sovereign immunity must be strictly construed. Id. (citing United States v. Nordic Vill., Inc., 503 U.S. 30, 34 (1992)).

B. Analysis

The court concludes that the United States has waived sovereign immunity as to Hartford's claim for impairment of suretyship in support of its protest. For Hartford's claim to survive, there must be "a clear statement from the United States waiving sovereign immunity," and the claim must fall within the terms of that waiver. Dolan v. U.S. Postal Serv., 546 U.S. 481, 498 (2006). The court will construe ambiguities in the waiver of sovereign immunity effected by § 1581 strictly

in favor of immunity.  United States v. Williams, 514 U.S. 527, 531 (1995); Netchem, Inc. v. United States, 38 CIT ___, ___, 961 F. Supp. 2d 1336, 1340 (2014).  In concluding that sovereign immunity is waived as to Hartford's claim here, the court is persuaded by the jurisdictional grant resulting from protest denial effected by 19 U.S.C. § 1514(a)(3) and 28 U.S.C. § 1581(a), in contrast to the more restrictive residual jurisdiction granted by § 1581(i).

     "In the trade context, the government 'unequivocally' consented to suit for certain actions, such as when an importer contests the denial of a protest."  Int'l Custom Prods., Inc. v. United States, 791 F.3d 1329, 1335 (Fed. Cir. 2015) (quoting Humane Soc'y of United States v. Clinton, 236 F.3d 1320, 1328 (Fed. Cir. 2001) ("[We] conclude that § 1581 not only states the jurisdictional grant to the [Court of International Trade], but also provides a waiver of sovereign immunity over the specified classes of cases.")), cert. denied, 136 S. Ct. 2408 (2016).  The statute, in relevant part, provides that this Court "shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under [19 U.S.C. § 1515]."  28 U.S.C. § 1581(a).  Section 1515 provides that Customs, "within two years from the date a protest was filed in accordance with section 1514 of this title, shall review the protest and shall allow or deny such protest in whole or in part."  19 U.S.C. § 1515(a).  Section 1514 and its subsection (a)(3), where challenges to Customs' demands on bonds properly lie, Hartford I, 544 F.3d at 1293, identify the following as protestable:  "any clerical error, mistake of fact, or other inadvertence, . . . adverse to the importer, in any entry, . . . and, decisions of the Customs Service, including the legality of all orders and findings entering into the same, as to all charges or exactions of whatever character within the jurisdiction of the Secretary of the Treasury." 19 U.S.C. § 1514(a)(3).  Under a plain reading of this framework, alongside the understanding that protests to bond demands are challenges to

charges, the statutes waive sovereign immunity over "any civil action" contesting the denial of a protest of, relevantly, "decisions of the Customs Service," "as to all charges" on a bond.

The Federal Circuit in <u>Lumbermens</u> considered an affirmative suit in the context of the Tucker Act, 28 U.S.C. § 1491, which, while waiving sovereign immunity as to "any express or implied contracts" between the government and suing party, did not permit, under longstanding precedent, suits against the government for contracts "implied-in-law." <u>Lumbermens</u>, 654 F.3d at 1316 (citing <u>Hercules Inc. v. United States</u>, 526 U.S. 417, 423 (1996)).  "[T]he problem here," said the Federal Circuit, "is that Lumbermens is asserting the theory of impairment of suretyship not as a defense, but as an affirmative cause of action." <u>Id.</u> at 1314.  The Federal Circuit found the surety's impairment argument, an affirmative claim which had evolved from the state law defensive theory of impairment of suretyship rights, to be "based on a noncontractual state law cause of action, or at most an implied-in-law contract theory." <u>Id.</u> at 1317.  The Court thus found "no waiver of sovereign immunity that unambiguously consents for the government to be sued based on" those equitable principles.  <u>Id.</u> at 1316.

<u>Lumbermens</u> does not address the situation at issue here, regarding this Court's jurisdiction under 28 U.S.C. § 1581(a) over a civil action filed by a surety challenging the denial of a protest filed pursuant to 19 U.S.C. § 1514(a)(3).  The claim before the court differs procedurally, functionally, and jurisdictionally from that in <u>Lumbermens</u>.  Hartford does not frame its impairment of suretyship argument as an affirmative claim, but rather as a defense to Customs' charges on the bonds.  Compl. ¶¶ 108–12, 139–43, 157–61, 178–82, 196–200, 215–219, 234–38, 253–57, 271–75.  Here, "[t]he true nature of the action is that Hartford seeks to avoid the payment of the demand." <u>Hartford I</u>, 544 F.3d at 1293.  Per the Federal Circuit's analysis in <u>Hartford I</u>, Hartford's argument is not, in essence, an affirmative claim for impairment of suretyship rights,

but "merely a theory of defense upon which Customs may grant the relief of cancelling a charge."

Id.

       The Government now relies, Def.'s Reply at 19–20, on Hartford II for the proposition that

"§ 1581 should not be read to waive sovereign immunity for a claim that is barred in other

contexts," specifically, in that case, "a state common law claim sounding in contract that is not

waived by the Tucker Act."  857 F. Supp. 2d at 1370.  Relevant to the sovereign immunity waiver

analysis in that case, the surety brought its claim under § 1581(i) after the protest period had

expired.  Hartford Fire Ins. Co. v. United States, 648 F.3d 1371, 1372 (Fed. Cir. 2011) (holding

that this Court had jurisdiction over surety's claim under § 1581(i) under the circumstances); see

Hartford II, 857 F. Supp. 2d at 1369.  However, Hartford II, a case concerned with jurisdiction

under § 1581(i) rather than (a), does not discuss the Hartford I holding that a common law surety

claim like impairment of suretyship would constitute a "theory of defense" to a charge, protestable

under 19 U.S.C. § 1514(a)(3).[56]  Hartford II, 857 F. Supp. 2d at 1369.  Section 1581 waives

sovereign immunity "over the specified classes of cases" contained therein.  Humane Soc'y, 236

F.3d at 1328.[57]  Unlike the scenario in Hartford II and in Lumbermens, where a surety attempted

to affirmatively claim impairment of its suretyship rights against the government, the instant case

sees the surety "challenging a charge," pursuant to 19 U.S.C. 1514(a)(3).  Hartford I, 544 F.3d at

1293.  The denial of a protest made under § 1514(a)(3) triggers review under 28 U.S.C. § 1581(a),

---

[56] The court in Hartford II did "not reach the issue of whether Hartford may raise impairment of
suretyship as a defense to a collection action instituted by Customs for recovery on the bonds,"
857 F. Supp. 2d at 1370 n.17, but noted that "an affirmative claim for impairment of suretyship . .
. may remain open to Hartford as a defense to the enforcement action on the bond."  Id. at 1370.

[57] The court notes that the underlying proceeding in Humane Soc'y was brought before the Court
of International Trade pursuant to § 1581(i).  236 F.3d at 1323, aff'g Humane Soc'y of United
States v. Clinton, 23 CIT 127, 44 F. Supp. 2d 260 (1999).

not (i).  The statutory framework providing the protest mechanism, and its review before this Court

under § 1581(a), accommodate an impairment of suretyship theory of defense to Customs'

charge.[58]

In summary, the case now before the court is not controlled by the Federal Circuit's

analysis in <u>Lumbermens</u>, regarding the waiver of sovereign immunity effected by the Tucker Act,

28 U.S.C. § 1491, or this Court's analysis thereof in <u>Hartford II</u>, considering the waiver effected

by § 1581, and specifically subsection (i), as to affirmative suits for impairment of suretyship

similar to that in <u>Lumbermens</u>. The instant scenario is essentially different in character, where a

party's claim is to the effect of "challenging a charge" which is subject to protest under 19 U.S.C.

§ 1514(a)(3) and 28 U.S.C. § 1581(a).  <u>Hartford I</u>, 544 F.3d at 1293.

Having determined that sovereign immunity does not bar this court from entertaining

Hartford's claim that Customs impaired its suretyship rights, the court now does so, and finds

Hartford's argument unavailing.  The court looks to the Restatement of Suretyship to examine the

---

[58] Were the court to accept the Government's arguments that sovereign immunity bars a surety from defensively raising an impairment of suretyship rights claim under § 1581(a), then, arguably, in order to make such a claim, sureties would be left in the position of declining to respond to Customs' payment demands and awaiting a potential enforcement action brought by the United States under 28 U.S.C. § 1582.  Sureties have properly raised impairment of suretyship rights as an affirmative defense before this court in those cases.  <u>See</u> <u>Great Am. Ins.</u>, 791 F. Supp. 2d 1337, 1359, <u>aff'd in part, rev'd in part</u>, <u>Great Am. Ins.</u>, 738 F.3d 1320, 1332 ("Great American also argues that Customs, by failing to provide notice pursuant to section 1504(c), impaired Great American's suretyship, <u>i.e.</u>, fundamentally altered its risk of loss, with the result that it is discharged from liability under the bonds."); Restatement of Suretyship § 49 cmt. b ("A suretyship defense is essentially an affirmative defense.").  It is unnecessary to prescribe that scenario when there exists no statutory bar to a surety raising its argument after paying Customs' demanded charges, filing a protest, and challenging that protest denial before this Court.  <u>Cf.</u> <u>Brother Int'l Corp. v. United States</u>, 27 CIT 1, 8, 246 F. Supp. 2d 1318, 1325 (2003) ("[A]n importer does not need to withhold payment and wait for Customs to initiate a suit under 28 U.S.C. § 1582 to seek judicial review of its claim. . . . Brother may pay the full amount requested by Customs under protest and seek review with this Court." (citing <u>Trayco, Inc. v. United States</u>, 994 F.2d 832, 839 (Fed. Cir. 1993))).

claim.  Great Am. Ins., 738 F.3d at 1332.  Integral to Hartford's theory is the assertion that

Customs, through an "act or omission that impairs . . . the secondary obligor's right of restitution

or subrogation," here the acceptance of ostensibly deficient bonds, "decreas[ed] [Hartford's]

potential ability to cause the principal obligor to bear the cost of performance," Restatement of

Suretyship § 37(3), (1), through which it would otherwise be able to recover against the principal.

See id. §§ 37 cmt. a ("Suretyship status gives the secondary obligor both the right to have the

principal obligor bear the cost of performance owed to the obligee and several mechanisms of

recourse against the principal obligor to effectuate that right."), 44 cmt. a ("[T]his section provides

that any act resulting in such impairment gives rise to the concomitant discharge of the secondary

obligor.").

　　　Broadly, Hartford's claim fails on the record before the court for two reasons.  First,

Hartford alleges no facts–let alone material facts lacking genuine dispute such that summary

judgment would be appropriate to its claim–in support of the argument that Customs' acceptance

of the SEBs renders Hartford unable to collect against its importer principals.  Pl.'s Br. at 29.

"[T]he burden of persuasion with respect to loss or prejudice caused by an obligee's act impairing

the secondary obligor's recourse against the principal obligor" lies with the secondary obligor who

"is in the business of entering into secondary obligations," meaning commercial sureties such as

Hartford.  Restatement of Suretyship § 49(2); id. cmt. a ("[I]f the act is an impairment of the

secondary obligor's recourse (§ 37(3)), the act must harm the secondary obligor."); id. cmt. b ("[A]

person in the business of entering into secondary obligations, such as a surety company, needs no

special assistance.").  But rather than persuade as to harm or increased difficulty in pursuing

recourse against the importer principals, Hartford summarily asserts that, because of Customs'

acceptance of the allegedly deficient bonds, "if Hartford tried to pursue action against the

importer/principals, the company would not be able to recover the amounts it is owed." Pl.'s Br.

at 29.   Hartford does no more than briefly restate its prior mixture of legal and factual

argumentation:  that the bonds are defective, and Customs, unauthorized to accept them, should

have instead rejected them.  Id.; see Great Am. Ins., 738 F.3d at 1332 (dismissing impairment of

suretyship defense due to surety's failure to allege sufficient facts); Wash. Int'l Ins. Co. v. United

States, 25 CIT 207, 224, 138 F. Supp. 2d 1314, 1330–31 (2001).  More generally, as noted supra

pp. 28–30, Hartford has not demonstrated on the record before the court any substantial prejudice

resulting from Customs' actions.  Moreover, this court holds that the bonds were not defective

under either the regulations or contract law.  See supra Sections III, IV.

Second, assuming arguendo that Hartford successfully demonstrated Customs' acceptance

of the bonds impaired its recourse against the importer principals, the court finds that Hartford

consented to that act and thus waived its suretyship impairment claim in the case of each SEB.

See Restatement of Suretyship § 48(1) ("The secondary obligation is not discharged pursuant to .

. . § 44 to the extent that, in the contract creating the secondary obligation or otherwise, the

secondary obligor consents to acts that would otherwise be the basis of the discharge . . . . Consent

may be express or implied from the circumstances.") (emphasis added).  The court points again to

Hartford's activities in the context of the three-party relationship established by the bonds.  See

Hartford II, 857 F. Supp. 2d at 1363 ("[T]he surety bears the burden of making inquiries and

informing itself of the relevant state of affairs of the party for whose conduct it has assumed

responsibility." (quoting Cam–Ful Indus., Inc. v. Fid. & Deposit Co. of Md., 922 F.2d 156, 162

(2d Cir.1991))); Ins. Co. of the W. v. United States, 243 F.3d 1367, 1370 (Fed. Cir. 2001) ("A

surety bond creates a three-party relationship, in which the surety becomes liable for the principal's

debt or duty to the third party obligee (here, the government)." (citing Balboa Ins. Co. v. United

States, 775 F.2d 1158, 1160 (Fed. Cir. 1985))).  As explained supra, Hartford, in step with customs

brokers acting on behalf of the importer principals, offered the bonds for acceptance by Customs,

and upon their acceptance, Hartford reviewed, through its general agent, copies of the submitted

SEBs, billed the importer principal premium on each of them, and retained that premium.  See

Restatement of Suretyship § 7 ("The requisites of contract formation apply generally to formation

of a contract creating a secondary obligation.").  The record does not provide that Hartford, either

sua sponte or through its general agent, expressed concern over the enforceability of these bonds;

it certainly did not cease transactions on the bases it alleges in this action.  These facts establish

Hartford's consent to the act that would, allegedly, otherwise serve as the basis of the discharge.

See Restatement of Suretyship § 48 cmt. b ("Consent may be express or it may be implied from

the circumstances."); U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 61 (2d Cir.

2004) ("[T]he Sureties' contention that they did not consent . . . is belied by the Sureties' refusal

to object to any of the changes once the Obligees had informed the Sureties that the changes had

been implemented. . . . the Sureties . . . simply stood by, took no action, and offered no opinion . .

. ."); see also Restatement of Contracts § 287(1) ("If a party, knowing of an alteration that

discharges his duty, manifests assent to the altered terms, his manifestation is equivalent to an

acceptance of an offer to substitute those terms.").

       For the foregoing reasons, Hartford has not established that Customs impaired its

suretyship rights.

**CONCLUSION**

Hartford's motion for summary judgment is denied, and the Government's cross-motion

for summary judgment is granted in part and denied in part.  Judgment will be entered accordingly.


/s/        Gary S. Katzmann
Judge


Dated: August 10, 2017
New York, New York